[No. D048103. Fourth Dist., Div. One. July 17, 2007.]

KEVIN McGARRY, Plaintiff and Appellant, v.
UNIVERSITY OF SAN DIEGO et al., Defendants and Respondents.

---

COUNSEL

Law Office of Robert N. Hocker and Robert N. Hocker for Plaintiff and Appellant.

Luce, Forward, Hamilton & Scripps, Phillip L. Kossy and Richard R. Spirra for Defendants and Respondents.

Sheppard, Mullin, Richter & Hampton and Guylyn R. Cummins for the Copley Press, Ed Graney and Mark Zeigler as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**McDONALD, J.**—Plaintiff Kevin McGarry's employment was terminated by the University of San Diego (University) as its head football coach in 2003. McGarry subsequently filed a lawsuit against University seeking damages for employment termination, and against University and others for defamation. The employment termination aspect of McGarry's lawsuit is not involved in the present appeal.

The present appeal involves McGarry's claims against University and two University officials, Robert Pastoor and Mary Lyons, for defamation. These claims were premised first on statements contained in a newspaper article (the

article), published in the San Diego Union-Tribune (Newspaper) two days after McGarry's employment was terminated, reporting the reasons for the termination. McGarry's defamation claims were secondarily premised on statements made by Lyons during a meeting with parents of members of the football team concerning McGarry's employment termination.

All defendants filed motions to strike the defamation claims pursuant to Code of Civil Procedure section 425.16,[1] commonly referred to as the anti-SLAPP (strategic lawsuit against public participation) statute. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57 [124 Cal.Rptr.2d 507, 52 P.3d 685].) The hearing on the motions was continued to permit limited discovery. McGarry moved to compel the deposition of Newspaper's reporters to question them about the article, but the trial court denied the motion pursuant to the so-called Shield Law.[2] The trial court ultimately granted defendants' anti-SLAPP motions to strike the defamation claims.

On appeal, McGarry argues the anti-SLAPP law was inapplicable because neither the statements to the press nor the statements to the parents qualified as protected conduct under the anti-SLAPP law. He alternatively asserts that, even if the anti-SLAPP law does apply, the trial court's ruling must be reversed for two distinct reasons. First, he argues that, insofar as his defamation claim was rooted in the statements to the parents, he demonstrated a probability of success on the merits. Second, he argues that, insofar as his defamation claim was rooted in the statements in the article, the trial court's application of the Shield Law was error and had the effect of precluding him from discovering evidence necessary to satisfy his burden to show a likelihood of success on the merits of his claim.

# I

## FACTUAL BACKGROUND

### A. *The Parties*

McGarry was employed by University for 26 years before his employment was abruptly terminated in 2003. He was the head coach of University's football team for the last seven years of his tenure, and had been named coach of the year. Pastoor was vice-president of student affairs for University, and Lyons was president of University.

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise specified.

[2] California Constitution, article I, section 2, subdivision (b); Evidence Code section 1070.

## B. *The Termination of Employment*

Shortly before McGarry was fired, University's athletic director departed and University hired JoAnn Nestor as the new athletic director. In early September 2003, shortly after Nestor's appointment, there was a tense exchange between McGarry and Nestor, and McGarry lodged a complaint against Nestor with University's human resources department. In late September, shortly after McGarry's complaint, Nestor approached McGarry and stated there had been a complaint by trainers that McGarry had kicked a football at them during a practice. McGarry told Nestor footballs were routinely removed from the field as a safety precaution and McGarry would often kick or throw them off the field but he had never aimed one at anyone. Nestor appeared satisfied with McGarry's explanation.

Approximately one week later, Nestor witnessed a verbal argument between McGarry and one of his coaching assistants. McGarry and the assistant resolved their differences and continued working alongside each other without further incident. However, Nestor generated an interoffice memo dated October 8 that purported to confirm their discussion concerning the football-kicking incident and memorialize McGarry's admission that he had kicked a football toward a player out of frustration with the player's multiple mistakes.

McGarry received Nestor's memo on October 16 and, later that evening, he received written instructions to report to Pastoor's office the following day. When McGarry arrived at Pastoor's office on October 17, one day before University's team was scheduled to play an important game in Indiana, McGarry was informed his employment had been terminated and he was banned from campus because of the football-kicking incident, the verbal argument incident, and a third incident (the cheerleader incident)[3] of alleged misconduct.

## C. *The Statements*

*The Article*

On Sunday, October 19, the article appeared in Newspaper stating, in its lead paragraph, that "[a] series of 'incidents' over the past two months led to

---

[3] In the "cheerleader incident," the article reported that in mid-August McGarry had changed the schedule for a football practice but, when he arrived at the field, he found a cheerleading camp had rented the field for their camp. The article reported that "when the cheerleaders refused to leave, the sources said, McGarry engaged in an obscenity-filled argument." The police report of the incident recited that McGarry, although angry when informed the camp could not move to accommodate his practice, was neither shouting nor profane during the incident.

[McGarry's employment termination], several sources at the school told [Newspaper]." It recited that the coaches and staff had been informed of the termination on Friday morning and were explicitly told "not to comment publicly about it." Although the article stated Pastoor and Nestor declined to comment because of "confidentiality related to personnel matters," the article went on to say "several [U]niversity officials, speaking on the condition of anonymity, outlined a 'culmination of events' " that led to the termination. The article later stated "the sources said three incidents in particular led to McGarry's immediate termination just hours before the team left for Indiana," and cited the football-kicking incident, the verbal argument incident, and the cheerleader incident.

### The Meeting

On October 25, Pastoor and Lyons held a closed door meeting with parents of the football players to discuss McGarry's employment termination and introduce the interim head coach. At that meeting, parents asked whether the reasons stated in the article were the only reasons for his termination, or whether he had posed a threat or harm to the players, and Lyons responded she could not comment on the reasons for his termination. One parent, after stating that the timing of the termination was bad, asked, "Was it criminal or morality dealing with this school? Yes or No? [¶] . . . [¶] If you say yes, I can live—I'll back you 100 [percent]. If you say no, your timing's bad and I can't back you [any] more. Criminal or morality?" Lyons eventually responded, "I can say that Coach McGarry was not involved to our knowledge in any criminal activity."

## II

## THE LITIGATION

### A. The Complaint

McGarry's defamation claims were based on the article and Lyons's statement at the meeting with parents. McGarry asserted University and Pastoor were responsible for leaking the three defamatory accusations contained in the article, they knew two of the incidents (the football-kicking incident and the obscenity-filled tirade in connection with the cheerleader incident) were false, and the third was an unremarkable dispute between

coaches. He also asserted Lyons's comments to the parents, when considered in context, contained an implied accusation that McGarry had committed unspecified immoral acts warranting immediate dismissal.

### B. *The Motions*

#### *The Anti-SLAPP Motion*

All defendants, asserting the gravamen of McGarry's claims were based on protected speech, moved to dismiss his defamation claims under the anti-SLAPP statute. Lyons argued McGarry could not show probable success on the merits because, even assuming her statement at the parents' meeting could be construed to contain an implied charge of immorality, the statement was not provably false and there was no clear and convincing evidence Lyons knew the statement was provably false. Pastoor, whose declaration denied he was the source of the leak for the article, asserted McGarry could not show probable success on the merits because McGarry had no admissible evidence that Pastoor was the source for the article's accusations. University asserted McGarry could not show probable success on the merits because University's liability was derivative of the liability of Pastoor and Lyons and, because the claims against them should be dismissed, the claims against University necessarily failed.

#### *The Shield Law Motion*

McGarry moved for and obtained a continuance of the hearing on the anti-SLAPP motions, apparently without objection by University, to allow McGarry to depose the authors of the article to obtain confirmation of the contents of and sources for the article.[4] However, Newspaper refused to allow the depositions under the Shield Law. When University was unable to determine the names of the sources who gave the reporters the information contained in the article,[5] McGarry moved to compel the depositions of Newspaper's reporters.

---

[4] McGarry anticipated University would object that the article was hearsay and therefore inadmissible evidence that the defamatory statements were made or the statements were uttered by University officials, and without competent evidence of those elements McGarry could not satisfy his burden under the anti-SLAPP statute. Accordingly, McGarry sought to depose the authors to preempt University's hearsay objection. McGarry correctly anticipated University's hearsay objection.

[5] McGarry allegedly directed interrogatories to University asking for the identity of all persons aware (prior to the publication of the article) that the three incidents were the basis for the termination, and University allegedly responded that Lyons, Pastoor, Nestor, Dan Yourg, and three other individuals had some knowledge of the reasons for McGarry's termination prior to the article being published. However, there was no evidence submitted to the trial court to support those allegations, and we therefore disregard those allegations for purposes of this appeal. We also grant University's motion to strike the documents contained at tabs 77 and

McGarry's motion to compel argued he was entitled, at a minimum, to ask the reporters to confirm that the statements contained in the article were in fact made by "[U]niversity officials," and those questions would not transgress the Shield Law. He also argued Newspaper had waived the Shield Law because a reporter allegedly told a third party Pastoor was the source of the statements. Newspaper opposed the motion, asserting the information sought by McGarry was within the Shield Law, and the protections of the Shield Law create an absolute immunity against compelled disclosure rather than a waivable privilege. The court denied McGarry's motion to compel the depositions.

### McGarry's Opposition to the Anti-SLAPP Motion

McGarry asserted University, Pastoor and Lyons did not show his defamation claims were subject to section 425.16 because the two sets of actionable statements were not taken in furtherance of defendants' constitutional rights of petition or free speech in connection with a public issue, as defined by the statute.[6] McGarry alternatively argued that, even if the burden shifted to him under the anti-SLAPP law, he had met the burden of showing probable success on the merits as to each set of claims.

The trial court granted the anti-SLAPP motions to strike. It first concluded defendants met their initial burden of showing the complained of conduct was within the ambit of the anti-SLAPP statute. It also concluded that, for two independent reasons, McGarry had not shown probable success on the merits. First, insofar as his defamation claim rested on Lyons's charge (by negative implication) of immoral conduct, McGarry had not shown this statement constituted actionable slander. Second, insofar as his defamation claim rested on the statements in the article, McGarry had no competent evidence that Pastoor was the source of the statements. Accordingly, the court granted the anti-SLAPP motions to strike.

### III

### THE ANTI-SLAPP LAW

The anti-SLAPP law provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of

---

78 in the appellant's appendix on appeal because this portion of the appendix purports to submit new evidence not before the trial court.

[6] Specifically, as to the claim based on the statements in the article, McGarry asserted the reasons for his termination were not a matter of public interest within the contemplation of the anti-SLAPP law. As to the claim based on Lyons's statement to the parents, McGarry argued the statements were neither a matter of public interest nor made in a public forum.

petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The purpose of the statute is to encourage participation in matters of public significance by allowing a court to promptly dismiss unmeritorious actions or claims brought to chill another's valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. (§ 425.16, subd. (a).)

■ The anti-SLAPP law involves a two-step process for determining whether a claim is subject to being stricken. In the first step, the defendant bringing an anti-SLAPP motion must make a prima facie showing that the plaintiff's suit is subject to section 425.16 by showing the defendant's challenged acts were taken in furtherance of his or her constitutional rights of petition or free speech in connection with a public issue, as defined by the statute. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733 [3 Cal.Rptr.3d 636, 74 P.3d 737].)

After the defendant satisfies the first step, the burden shifts to the plaintiff to demonstrate there is a reasonable probability he or she will prevail on the merits at trial. (§ 425.16, subd. (b)(1).) In this phase, the plaintiff must show both that the claim is legally sufficient and there is admissible evidence that, if credited, would be sufficient to sustain a favorable judgment. (*Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 823 [33 Cal.Rptr.2d 446], disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5.; *Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 358 [42 Cal.Rptr.2d 464].) In making this assessment, the court must consider both the legal sufficiency of and evidentiary support for the pleaded claims, and must also examine whether there are any constitutional or nonconstitutional defenses to the pleaded claims and, if so, whether there is evidence to negate any such defenses. (*Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 398–399 [13 Cal.Rptr.3d 353].)

■ In considering whether a plaintiff has met those evidentiary burdens, the court must consider the pleadings and the evidence submitted by the parties. (§ 425.16, subd. (b)(1), (2).) However, the court cannot weigh the evidence (*Looney v. Superior Court* (1993) 16 Cal.App.4th 521, 537–538 [20 Cal.Rptr.2d 182]) but instead must simply determine whether the plaintiff's evidence would, if credited, be sufficient to meet the burden of proof.

(*Wilcox v. Superior Court, supra*, 27 Cal.App.4th at pp. 823–825 [standard for assessing evidence is analogous to standard applicable to motions for nonsuit or directed verdict].)

On appeal, we review de novo the trial court's ruling on the motion to strike. (*Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 339 [9 Cal.Rptr.3d 197].)

## IV

## DEFENDANTS SATISFIED THEIR PRIMA FACIE BURDEN

The trial court concluded the complained of statements constituted speech in connection with a public issue qualifying for anti-SLAPP treatment under section 425.16, subdivision (e)(4). McGarry occupied a high-profile position in San Diego's athletic community, and the abrupt termination of his employment, coming in the middle of a successful season and on the eve of an important game, was an issue of import to a substantial segment of the public. It was important to those immediately affected by the change in leadership, including the players, the players' parents, and the staff connected to University football team. Moreover, it was of import to those who follow the team's fortunes, including University's current students, University's alumni and boosters,[7] potential recruits to the football team, and peripheral fans of the team. Finally, the loss of a team's head coach is of import to competitor schools, both for its immediate impact on the team's performance in the remaining contests for the current season and for the reverberations on recruiting players for future seasons.

McGarry asserts that, even assuming his employment termination was a public issue, the *reasons* for his termination were private and confidential matters, and therefore not converted into a matter of public interest merely because the public was curious about the reasons. However, the court in

---

[7] Additionally, University argued below, and McGarry did not dispute, that successful athletic programs are a significant factor in garnering donations to universities, and the public perceptions of University's handling of McGarry's employment termination could influence the influx of money that benefits University as a whole. Accordingly, McGarry's employment termination had indirect impacts on all persons associated with University insofar as it could influence potential donors to University's programs.

*Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534 [33 Cal.Rptr.3d 145], noting section 425.16 does not provide a definition for "an issue of public interest," explained: " 'A few guiding principles may be derived from decisional authorities. First, "public interest" does not equate with mere curiosity. [Citations.] Second, a matter of public interest should be something of concern to a substantial number of people. [Citation.] Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. [Citation.] Third, there should be some degree of closeness between the challenged statements and the asserted public interest [citation]; the assertion of a broad and amorphous public interest is not sufficient [citation]. Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort "to gather ammunition for another round of [private] controversy . . . ." [Citation.] Finally, "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." [Citation.] A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people. [Citations.]' (*Weinberg v. Feisel* [(2003)] 110 Cal.App.4th [1122,] 1132–1133 [2 Cal.Rptr.3d 385].)" (*Terry,* at pp. 1546–1547.)

Here, the considerations outlined in *Terry* convince us the statements concerning McGarry's employment termination qualify for anti-SLAPP treatment. His termination was of concern to a substantial number of people, and it is difficult to imagine a greater "closeness" between the topic of the public interest (the termination) and the challenged statements (the *reasons* for the termination). Indeed, the focus of the speakers' statements were to respond to the public interest "rather than a mere effort 'to gather ammunition for another round of [private] controversy.' " (*Weinberg v. Feisel, supra,* 110 Cal.App.4th at pp. 1132–1133.) Finally, University, Pastoor and Lyons did not by their conduct create a defense by thrusting McGarry into the public eye; McGarry's role as head coach of a local university's football team already made him a public figure, and his employment termination was already a topic of widespread public interest.

■ McGarry correctly notes that, although we are admonished to broadly construe the anti-SLAPP statute, it "cannot be invoked by a defendant whose assertedly protected activity is illegal as a matter of law and, for that reason, not protected by constitutional guarantees of free speech and petition." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 317 [46 Cal.Rptr.3d 606].) He argues that because the content of the statements here—University's reasons for terminating his employment—involve the unauthorized disclosure of confidential and privileged information that can *never* qualify as protected

speech, it was error to apply the anti-SLAPP statute. However, McGarry cites no relevant authority holding that otherwise *public* acts by an employee are transmogrified into confidential personnel information merely because the employer subjectively relies on them as grounds to terminate the employee.[8] The only case cited by McGarry—*Payton v. City of Santa Clara* (1982) 132 Cal.App.3d 152 [183 Cal.Rptr. 17]—involved disclosure of a confidential interoffice memo explaining the employee had been terminated from employment for dishonesty, unauthorized absences and violation of departmental rules. There was no suggestion these transgressions were public acts by the employee or were otherwise known to the public.[9]

▆ We conclude the trial court correctly found the complained of conduct was speech in connection with a public issue or a matter of public interest within the meaning of section 425.16, subdivision (e)(4). Accordingly, the burden shifted to McGarry to show there was a reasonably probability he would prevail on the merits at trial by demonstrating his claim was legally sufficient and that there was admissible evidence that, if credited, would be sufficient to sustain a favorable judgment for him.

## IV

## DEFAMATION PRINCIPLES

McGarry asserts the statements contained in the article and made by Lyons were defamatory. Before evaluating the rulings of the trial court as to each set of statements,[10] we outline the general principles that guide our resolution of claims for defamation by a limited public figure.

---

[8] McGarry quotes isolated statements from University staff who deflected questions about his termination by stating University was bound by "strict ethical standards and the directives of State and Federal law to protect [McGarry's] privacy [and thus] there [has] not been, nor will there be[,] any comments from the University about his employment situation." However, McGarry does not identify *which* "directive[] of State [or] Federal law" was offended by the complained of conduct, and we are not persuaded by McGarry's implicit argument that these comments amounted to a waiver of University's protections under the anti-SLAPP statute.

[9] Moreover, the *Payton* case did not involve a claim for defamation, but instead alleged the disclosure violated the employee's right to privacy. McGarry alleged a claim for defamation, not a claim asserting his privacy rights had been transgressed. Although McGarry suggests, for the first time on appeal, that his complaint should have been evaluated as though he had in fact asserted a claim for invasion of privacy, we ordinarily do not consider theories not raised below, particularly when they involve disputed factual matters. Whether *McGarry* had a legitimate expectation of privacy in *University's* reasons for terminating him was not raised below and we decline to consider it at this stage.

[10] McGarry's defamation claims rest on two distinct sets of allegedly defamatory statements. Accordingly, we evaluate separately each set of statements to determine whether McGarry has shown there is a reasonable probability he will prevail on the merits as to either set of statements.

A. *The Defamatory Statement*

A claim for defamation requires proof of a false and unprivileged publication that exposes the plaintiff "to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.) A statement is defamatory when it tends "directly to injure [a person] in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits." (Civ. Code, § 46, subd. 3.) Statements that contain such a charge directly, and without the need for explanatory matter, are libelous per se. (Civ. Code, § 45a.) A statement can also be libelous per se if it contains a charge by implication from the language employed by the speaker and a listener could understand the defamatory meaning without the necessity of knowing extrinsic explanatory matter. (*MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 548–550 [343 P.2d 36].) However, if the listener would not recognize the defamatory meaning without "knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons" (*Barnes-Hind, Inc. v. Superior Court* (1986) 181 Cal.App.3d 377, 387 [226 Cal.Rptr. 354]), the matter is deemed defamatory per quod and requires pleading and proof of special damages. (*Ibid.*)

"The sine qua non of recovery for defamation . . . is the existence of falsehood." (*Letter Carriers v. Austin* (1974) 418 U.S. 264, 283 [41 L.Ed.2d 745, 94 S.Ct. 2770], italics omitted.) Because the statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected. (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260 [228 Cal.Rptr. 206, 721 P.2d 87].) However, the court in *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1 [111 L.Ed.2d 1, 110 S.Ct. 2695], refining the distinction between nonactionable statements of opinion and actionable assertions of false facts, rejected the contention that statements of opinion enjoy blanket constitutional protection. *Milkovich* reasoned that "[s]imply couching such statements in terms of opinion does not dispel these [false, defamatory] implications" (*id.* at p. 19) because a speaker may still imply "a knowledge of facts which lead to the [defamatory] conclusion" (*id.* at p. 18). The court explained that expressions of opinion may imply an assertion of objective fact, and a statement that implies a false assertion of fact, even if couched as an opinion, can be actionable. (*Id.* at pp. 18–19.)

 Thus, under *Milkovich*, the question is not strictly whether the published statement is fact or opinion, but is instead "whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact. [Citations.] . . . [¶] Whether a statement declares or implies a provably false assertion of fact is a question of law for the court to decide [citations], unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood [citations]." (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 [10 Cal.Rptr.3d 429].)

 To determine whether a statement is actionable fact or nonactionable opinion, courts use a totality of the circumstances test of whether the statement in question communicates or implies a provably false statement of fact. (*Franklin v. Dynamic Details, Inc., supra*, 116 Cal.App.4th at p. 385.) Under the totality of the circumstances test, "[f]irst, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense. . . . [¶] Next, the context in which the statement was made must be considered." (*Baker v. Los Angeles Herald Examiner, supra*, 42 Cal.3d at pp. 260–261.)

### B. *Constitutional Malice and Clear and Convincing Evidence*

*Public Figure*

 A threshold determination in a defamation action is whether the plaintiff is a "public figure." The courts have "defined two classes of public figures. The first is the 'all purpose' public figure who has 'achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts.' The second category is that of the 'limited purpose' or 'vortex' public figure, an individual who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.' ([*Gertz v. Robert Welch, Inc.* (1974)] 418 U.S. [323,] 351 [41 L.Ed.2d 789, 94 S.Ct. 2997]].) Unlike the 'all purpose' public figure, the 'limited purpose' public figure loses certain protection for his [or her] reputation only to the extent that the allegedly defamatory communication relates to his [or her] role in a public controversy." (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 253–254 [208 Cal.Rptr. 137, 690 P.2d 610].)

*Constitutional Malice*

When the plaintiff is a public figure, he or she may not recover defamation damages merely by showing the defamatory statement was false. Instead, the plaintiff must also show the speaker made the objectionable statement with malice in its constitutional sense " 'that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' " (*Reader's Digest Assn. v. Superior Court, supra,* 37 Cal.3d at p. 256.) The test is "a subjective test, under which the defendant's actual belief concerning the truthfulness of the publication is the crucial issue. [Citation.] This test directs attention to the 'defendant's attitude toward the truth or falsity of the material published[,] . . . [not] the defendant's attitude toward the plaintiff.' (*Widener v. Pacific Gas & Electric* Co. (1977) 75 Cal.App.3d 415, 434 [142 Cal.Rptr. 304][, disapproved on other grounds in *McCoy v. Hearst Corp.* (1986) 42 Cal.3d 835, 846, fn. 9 [231 Cal.Rptr. 518, 727 P.2d 711]].)" (*Reader's Digest,* at p. 257.)

The reckless disregard test is not a negligence test measured by whether a reasonably prudent person would have published, or would have investigated before publishing, the defamatory statement. (*St. Amant v. Thompson* (1968) 390 U.S. 727, 731 [20 L.Ed.2d 262, 88 S.Ct. 1323].) Instead, the evidence must "permit the conclusion that the defendant actually had a 'high degree of awareness of . . . probable falsity.' [Citation.] As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. [Citations.]" (*Harte-Hanks Communications v. Connaughton* (1989) 491 U.S. 657, 688 [105 L.Ed.2d 562, 109 S.Ct. 2678].) Instead, to support a finding of actual malice, the failure to investigate must fairly be characterized as demonstrating the speaker purposefully avoided the truth or deliberately decided not to acquire knowledge of facts that might confirm the probable falsity of charges. (*Antonovich v. Superior Court* (1991) 234 Cal.App.3d 1041, 1049 [285 Cal.Rptr. 863].)

The requisite malice must be shown by clear and convincing evidence. This standard requires that the evidence of actual knowledge of the falsity or reckless disregard for its falsity must be of such a character "as to command the unhesitating assent of every reasonable mind." (*Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 274 [105 Cal.Rptr.2d 674].)

## V

## McGARRY WAS A LIMITED PURPOSE PUBLIC FIGURE

McGarry asserts he was not a limited purpose public figure, and therefore need not meet the more stringent constitutional malice standards and its associated quantum of proof, because the position he held and the reasons for his employment termination did not involve a dispute affecting the general public or some segment of the general public in any appreciable way.

Numerous courts, beginning with the Supreme Court's opinion in *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975], have concluded professional and collegiate athletes and coaches are at least limited purpose public figures. (See, e.g., *Brewer v. Memphis Pub. Co., Inc.* (5th Cir. 1980) 626 F.2d 1238, 1254–1255; *Chuy v. Philadelphia Eagles Football Club* (E.D.Pa. 1977) 431 F.Supp. 254, 267.) "[A] common thread in these cases is that one's voluntary decision to pursue a career in sports, whether as an athlete or a coach, 'invites attention and comment' regarding his job performance and thus constitutes an assumption of the risk of negative publicity." (*Barry v. Time, Inc.* (N.D.Cal. 1984) 584 F.Supp. 1110, 1119.) The court in *Time, Inc. v. Johnston* (4th Cir. 1971) 448 F.2d 378, 380, holding a professional basketball player was deemed a limited public figure for purposes of his libel suit alleging he had been defamed in an article questioning his conduct as a player, explained: "He had offered his services to the public as a paid performer and had thereby invited comments on his performance as such. In a sense, he assumed the risk of publicity, good or bad, as the case might be, so far as it concerned his public performance. The publication in question related strictly to his public character. It made no reference to his private life, it involved no intrusion into his private affairs. It dealt entirely with his performance as a professional basketball player; it discussed him in connection with a public event in which the plaintiff as a compensated public figure had taken part voluntarily."

McGarry voluntarily entered the public arena as a college football coach, and the statements dealt exclusively with his performance of the public role he voluntarily undertook. We conclude McGarry was a limited purpose public figure for purposes of the allegedly defamatory statements.

## VI

## LYONS'S STATEMENT

We must assess whether McGarry showed a likelihood of success on the merits in light of the applicable standards for a defamation claim by a limited

public figure. (*Rosenaur v. Scherer, supra,* 88 Cal.App.4th at p. 274.) We conclude McGarry did not show he was likely to prevail on the merits of his claim, insofar as it was based on Lyons's statement, for at least two reasons.[11]

■ First, we conclude the complained of statement was not reasonably susceptible of being interpreted to imply a provably false assertion of fact. (Cf. *Couch v. San Juan Unified School Dist.* (1995) 33 Cal.App.4th 1491, 1500 [39 Cal.Rptr.2d 848] [whether statement reasonably susceptible of interpretation which implies provably false assertion of fact is question of law for court].) Lyons's statement did not *expressly* assert McGarry's employment had been terminated because of immoral behavior.[12] Moreover, even assuming we accepted McGarry's claim that Lyons impliedly asserted he had engaged in some unspecified immoral behavior, the statement still is incapable of being interpreted as implying a *provably false* assertion of *fact.*

---

[11] We apprehend McGarry's evidentiary showing on this claim may have been insufficient for a third reason—the absence of a showing of special damages from Lyons's statement. Lyons's statement was on its face nondefamatory—she stated McGarry was "not involved to our knowledge in any criminal activity." It could *only* have been understood in a defamatory sense if the listener was aware that the question preceding her response had asked if McGarry had been involved in criminal or moral offenses. Because the listener was required to have "knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons" (*Barnes-Hind, Inc. v. Superior Court, supra,* 181 Cal.App.3d at p. 387), the statement may well be only defamatory per quod and require pleading and proof of special damages (*ibid.*). Although McGarry pleaded a claim for defamation per quod, McGarry's opposition to the anti-SLAPP motion was apparently silent on what special damages he sustained as the result of Lyons's statements to the parents during the closed door meeting.

[12] When assessing whether the statement is reasonably susceptible of an interpretation that implies a provably false assertion of fact, the court examines "whether the reasonable or 'average' reader would so interpret the material. [Citations.] The 'average reader' is a reasonable member of the audience to which the material was originally addressed. [Citations.]" (*Couch v. San Juan Unified School Dist., supra,* 33 Cal.App.4th at p. 1500.) If it is equally of both an innocent and libelous construction, it is for the jury to decide how the statement was understood. (*Franklin v. Dynamic Details, Inc., supra,* 116 Cal.App.4th 375, 385.) Even were we to conclude the statement was equally susceptible of an interpretation that Lyons was charging McGarry with immoral behavior, McGarry's anti-SLAPP burden would require evidence showing a jury would likely find the listeners understood it to in fact charge McGarry with immoral behavior. However, the *only* evidence in this record is that the audience did *not* understand Lyons's words to charge McGarry with immoral behavior. Specifically, the parent asked "Was it criminal or morality . . . ? Yes or No? [¶] . . . [¶] If you say yes, I can live—*I'll back you 100 [percent]. If you say no, your timing's bad and I can't back you [any] more.*" After Lyons responded, "I can say that Coach McGarry was not involved to our knowledge in any criminal activity," the audience's immediate response was, "Then it's unacceptable. [¶] Then this was not right." Because the listeners voiced a willingness to *support* University's action if McGarry had engaged in either criminal *or* immoral conduct, but Lyons's statement failed to convince them to support the action, the evidence undercuts (rather than supports) McGarry's claim that the listeners understood her statement as charging him with immoral conduct.

Behavior that might qualify as immoral to one person, although being perfectly acceptable to another person, demonstrates that an amorphous assertion of immoral behavior is within the range of statements of opinion that are not actionable.

Because Lyons's statement contains no hint of what conduct she believed McGarry had engaged in that would be immoral, her statement neither contained nor implied a provably false assertion of fact, but at most implied an opinion. We agree with the court in *Held v. Pokorny* (S.D.N.Y. 1984) 583 F.Supp. 1038, which concluded a statement that the plaintiff was immoral was a nonactionable statement of opinion, and its observation that "concepts [of morality] are infinitely debatable, and their precise meaning is extremely elusive. As Justice Hunt noted over 100 years ago, the principle of right and wrong, or morality or immorality, is impossible as an element of proof . . . . [¶] . . . [¶] Indeed, the Court could not instruct the jury on how to evaluate the truth of a charge of immorality without entering an age old debate better left to philosophers." (*Id.* at p. 1040, fns. omitted.)

The amorphous nature of the implied assertion is fatal for a second reason: McGarry's evidence did not demonstrate malice, i.e., that Lyons subjectively believed her statement was (or was likely) a false statement. Lyons's declaration accompanying her anti-SLAPP motion affirmatively averred that she believed, based on information she had received from people she believed to be reliable sources, that McGarry had engaged in some conduct she believed to be immoral. McGarry produced no contrary evidence, much less evidence capable of " 'command[ing] the unhesitating assent of every reasonable mind' " (*Rosenaur v. Scherer, supra,* 88 Cal.App.4th at p. 274), that Lyons subjectively believed McGarry in fact had not (or likely had not) engaged in the underlying conduct, or that she subjectively believed the underlying conduct was not immoral.

Because McGarry has no evidence Lyons made a statement reasonably susceptible of being interpreted to imply a provably false assertion of fact, nor clear and convincing evidence the opinion she did express was based on facts she either knew were false or believed were likely to be false, McGarry cannot show a likelihood of success on the merits and the court's ruling granting Lyons's anti-SLAPP motion was therefore correct.

## VII

### THE ARTICLE'S STATEMENTS

The trial court, after denying McGarry's motion to compel the depositions of Newspaper's reporters, granted Pastoor's anti-SLAPP motion because

McGarry had no competent evidence Pastoor was the source of the statements. The trial court also granted University's anti-SLAPP motion because McGarry had no competent evidence upon which to premise respondeat superior liability for University for the statements contained in the article.

McGarry argues it was error to deny the motion to compel the depositions of Newspaper's reporters, and the error requires reversal of the rulings on the anti-SLAPP motions. First, he argues Newspaper waived the protections of the Shield Law and therefore should have been compelled to reveal that Pastoor (or perhaps some other University official for whom University would have respondeat superior liability) made the defamatory statements. He alternatively argues, even were he barred from obtaining the precise identity of the source, it was nevertheless error to deny the depositions because the limited information he sought was outside the protections of the Shield Law, and the limited information he was entitled to obtain would have met his anti-SLAPP burden of showing a likelihood of success on his defamation claims. Accordingly, he argues the erroneous denial of his discovery motion requires reversal of the rulings on Pastoor's and University's anti-SLAPP motions because those depositions would have garnered evidence that would have satisfied his anti-SLAPP burden.

## A. *The Article*

The October 19 article reported *"several sources at the school* told [Newspaper]" it was a "series of 'incidents' over the past two months" that led to McGarry's employment termination, and later stated *"several* [U]niversity *officials*, speaking on the condition of anonymity, outlined a 'culmination of events' " that led to McGarry's termination. (Italics added.) The article contained no specification of what these "incidents" or "events" were until recitation later in the article that "[t]he *sources* said three incidents in particular" (italics added) led to McGarry's termination, and specified the football-kicking incident, the verbal argument incident, and the cheerleader incident.

## B. *The Shield Law*

California law provides that "A publisher, editor, reporter, or other person connected with or employed upon a newspaper . . . shall not be adjudged in contempt by a judicial . . . body . . . for refusing to disclose the source of any information procured while so connected or employed for publication . . . or for refusing to disclose any unpublished information obtained or prepared in

gathering, receiving or processing of information for communication to the public." (Cal. Const., art. I, § 2, subd. (b); see also Evid. Code, § 1070, subd. (a).)

### C. *The Immunity Was Not Waived*

McGarry appears to concede, absent a determination the authors of the article (Graney & Zeigler) can be held to have waived the protections of the Shield Law, he could not obtain a court order compelling them to identify *who* stated (as reported in the article) McGarry had "engaged in an obscenity-filled argument" in connection with the cheerleader incident or stated he had "kick[ed] a ball at a member of the training staff." However, McGarry asserts that because Zeigler allegedly told a third party (Mr. Gosen) Pastoor was Graney's source, the reporters should be deemed to have waived the protections of the Shield Law and McGarry should be entitled to an order compelling Graney and Zeigler to answer whether Pastoor was the person who told them McGarry had engaged in an obscenity-filled argument and had kicked a ball at a member of the training staff.

### *Factual Basis for Waiver Argument*

McGarry deposed Mr. Gosen, the sports information director for University, and asked about a telephone conversation between Gosen and Zeigler. During that telephone conversation, Zeigler allegedly told Gosen that "Graney had had some prior communication with Dr. Pastoor where Dr. Pastoor allegedly confirmed the same three incidents" after Pastoor "went off the record."

### *The Immunity Was Not Waived*

 Newspaper argues that the Shield Law provides an immunity not forfeited on the facts presented here.[13] The embodiment of the Shield Law into the California Constitution evidenced an intention to provide the broadest protections for a journalist's unpublished materials and sources for information, whether published or unpublished. (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 796–805 [268 Cal.Rptr. 753, 789 P.2d 934].) In *New York Times Co. v. Superior Court* (1990) 51 Cal.3d 453 [273 Cal.Rptr. 98, 796 P.2d 811], the court concluded the Shield Law confers an absolute immunity against

---

[13] Newspaper also argues the hearsay nature of the testimony is insufficient to overcome the immunity. Although the hearsay rule would preclude McGarry from using Zeigler's statements as affirmative proof that Pastoor was in fact the person who made the allegedly defamatory statements to Graney, McGarry is not offering Zeigler's statements as proof of the matters asserted therein. Instead, McGarry offered Zeigler's statements for a nonhearsay purpose, i.e., to show Zeigler waived the immunity. Accordingly, the hearsay rule is not a bar to McGarry's waiver argument.

compelled disclosure of the protected information and, although that immunity must occasionally yield when it threatens to frustrate the competing federal constitutional right of a criminal defendant to a fair trial, there is no analogous competing right of a civil litigant that will suffice to overcome the immunity. (*New York Times*, at p. 456.)

 The issue of whether a party may obtain unpublished information because the journalist waived the immunity by his or her published information was addressed by the court in *Playboy Enterprises, Inc. v. Superior Court* (1984) 154 Cal.App.3d 14 [201 Cal.Rptr. 207]. The court rejected that claim, reasoning the Shield Law protects all unpublished information, even information that "could or would confirm or amplify the published information derived therefrom." (154 Cal.App.3d at p. 23.) Moreover, the court rejected the argument that the journalist, by publishing quotes and attributing them to the plaintiff Marin, had no "cognizable interest in refusing to disclose its working and editorial materials to protect the confidentiality of its source and thus has no further interest in protecting its undisseminated material." (*Ibid.*) The court reasoned that any undisseminated material remained protected by the Shield Law, including materials that "would confirm or refute the accuracy of the statements attributed to plaintiff Marin in the Playboy Magazine article [because it] is evident that the published information attributed to Marin in the article is either based upon or related to the underlying records of the interview. Accordingly, this material falls squarely within the ambit of [the Shield Law's] protection whether the published information is an exact transcription of the source material or paraphrases or summarizes it." (154 Cal.App.3d at pp. 23–24.) Thus, the court held that unpublished information remained protected even though the journalist published some information and published the identity of the source. Here, McGarry claims that revealing the identity of a source for the article constituted a waiver of the protections for unpublished information, to wit, the identity of the source of information for the articles. Under *Playboy Enterprises, Inc.*, we do not believe a limited disclosure can be deemed to waive the immunity for refusing to reveal unpublished information, including the unidentified sources of the information.[14]

McGarry cites no pertinent authority supporting his claim that the reporters' immunity was waived. Because the Shield Law is absolute on its face, and McGarry has no countervailing federal constitutional right against which

---

[14] Under California law, even had Zeigler been subpoenaed for a deposition and made these revelations in that deposition, he would not be deemed to have waived the immunities provided by the Shield Law. (§ 1986.1, subd. (a).) Moreover, we note there may be an additional defect in McGarry's argument that has not been briefed by the parties. McGarry appears to assert Graney's immunity has been forfeited by Zeigler's statements to Gosen. We question how *Zeigler's* disclosures could be deemed to have waived the immunity conferred on *Graney*, but it is unnecessary to reach that question here.

the reporters' state constitutional protections must be balanced, we conclude the reporters could not be compelled to reveal the sources for their article.

### D. *The Limited Discovery Would Not Have Satisfied McGarry's Anti-SLAPP Burden*

McGarry asserts that, even without an order compelling the reporters to disclose the *identity* of the sources, the court's ruling on the anti-SLAPP motion should nevertheless be reversed. He asserts the limited information he sought was *outside* the protections of the Shield Law because he sought only an order compelling the reporters to, in effect, repeat under oath the facts stated in the article. McGarry notes the article alone was incompetent (under the hearsay rule) to prove either the content of the defamatory statements or that "[U]niversity officials" uttered the defamatory statements, and he argues he was entitled to obviate University's hearsay objection to the article by compelling the reporters to verify they heard the defamatory statements from (in the words of the article) "several sources at the school" or "[U]niversity officials." He asserts this would not have offended the Shield Law because such limited testimony would not require the reporters to reveal anything beyond the published materials.

We conclude it is unnecessary to determine whether the Shield Law precludes deposing the reporters for the limited purposes proposed by McGarry, because even if the trial court erred by preventing McGarry from obtaining the testimony he sought, the testimony would still have been ineffective to satisfy his anti-SLAPP burden. It is necessary to conduct a separate evaluation of McGarry's claim against Pastoor and his claim against University because distinct, albeit overlapping, considerations convince us that compelling the reporters to authenticate or verify the article's content would not have provided McGarry with evidence that would have satisfied his anti-SLAPP burden.

#### Claim Against Pastoor

McGarry's cause of action against Pastoor required proof that Pastoor was the utterer of the defamatory statements. Even ignoring that the attribution contained in the article is ambiguous,[15] the article (and presumably the

---

[15] The article initially states "several sources *at the school*" told Newspaper of a "series of 'incidents' " that led to McGarry's termination (without specifying what those events were), and only later stated "several [*U*]*niversity officials* . . . outlined a 'culmination of events' " leading to the termination, *again* without specifying what those events were. The article did not specify what the "incidents" or "events" were until later in the article, when the article recited that "*the sources* said three incidents in particular" led to McGarry's termination. It is unclear whether "*the sources*" who described the incidents were the "several sources at the

reporters' repetition thereof at a deposition) would not identify which of the defamatory utterances (if any) were attributable to Pastoor rather than to one of the other "several sources at the school." McGarry claims a jury could infer, by process of elimination, Pastoor must have been the utterer because he was the only individual who both knew the underlying reasons for the termination and spoke to the press prior to October 19. However, McGarry concedes there were numerous other individuals (Lyons, Nestor, Kevin Blackmun, a "few individuals" working in University human resources department, and perhaps Yourg and Gosen)[16] aware of what underlying incidents formed the basis for University's decision to terminate him prior to October 19, and the article contains nothing that would narrow the field of potential sources to Pastoor.[17] McGarry claims the jury could infer Pastoor must have been the source because University purportedly conceded that only three people associated with University (Pastoor, Gosen and Yourg) knowledgeable about the termination spoke to the press. Even assuming the evidence McGarry relies on for this assertion had been presented below (but see fn. 5), the evidence does not support more than speculation that Pastoor rather than Gosen or Yourg (or perhaps another person who spoke to the press but did not reveal that fact to University) was the source of some or all of the defamatory statements.

Moreover, the applicable standard of proof required for McGarry's defamation action requires clear and convincing evidence the speaker uttered the defamatory remarks knowing them to be false or in reckless disregard of their truth or falsity. We apprehend that this requirement necessarily incorporates the same standard of proof for the identity of the utterer, because clear and convincing evidence of the utterer's state of mind cannot proceed without clear and convincing evidence identifying *whose* "state of mind" is at issue. While McGarry's proposed "process of elimination" might provide a tenuous inference that Pastoor was the utterer of either or both of the complained of statements, it would not provide clear and convincing evidence that he (rather than some other person whose state of mind would be relevant) spoke the words with constitutional malice.

---

school" (without any claim these sources were officials of University) referred to in the initial paragraph, or were instead the "several [U]niversity officials" referred to in the second paragraph of the article.

[16] McGarry argues Gosen can be eliminated because Gosen did not know the reasons for McGarry's termination prior to October 19. There is no evidence in the record supporting this assertion. McGarry also asserts Yourg can be eliminated because he was "not involved in the decision to terminate McGarry," but McGarry neither cites pertinent evidence supporting this claim nor explains how Yourg's nonparticipation in the termination necessarily means Yourg was unaware of University's reasons for terminating McGarry.

[17] To the extent the article (and presumably the reporters' repetition thereof at a deposition) would have been useful to narrow the field, it stated Pastoor and Nestor "continued to decline comment" on the reasons for McGarry's termination.

Finally, the anti-SLAPP burden requires a showing the evidence would likely support a verdict in plaintiff's favor. However, McGarry's proposed use of the reporters' testimony—merely to authenticate what was written in the article—would likely be stricken at trial because the Shield Law would preclude Pastoor from probing the facts stated in the article to dispel the inference McGarry seeks to draw. (See generally *Fost v. Superior Court* (2000) 80 Cal.App.4th 724, 730–738 [95 Cal.Rptr.2d 620].) Specifically, the Shield Law would bar Pastoor from cross-examining the reporters to elicit evidence that could rebut the inference that he (rather than Yourg, Gosen, Nestor, Blackmun, individuals working in University human resources department, or someone else) was the source of the statements, because such inquiries would necessarily delve into the unpublished materials or confidential sources that fall within the Shield Law's immunity and the reporters have refused to divulge.[18]

For all of these reasons, we conclude that even if the Shield Law does not protect the reporters against compelled "authentication" of the article, the refusal to compel their deposition does not require reversal of the order striking McGarry's defamation claim against Pastoor because the testimony would not have satisfied McGarry's anti-SLAPP burden as against Pastoor.

### Claim Against University

McGarry's cause of action against University required proof the utterer of the defamatory statements (1) was an employee of University acting within the course and scope of his or her employment (*Perez v. City of Huntington Park* (1992) 7 Cal.App.4th 817, 820 [9 Cal.Rptr.2d 258]) and (2) acted with constitutional malice. We conclude, for reasons analogous to those stated in connection with McGarry's claim against Pastoor, the reporters' recitation under oath of the facts stated in the article would not have satisfied McGarry's anti-SLAPP burden to show a likelihood of success on his claim against University.

First, although McGarry argues the article's attribution of the statements to "[U]niversity officials" is sufficient to establish respondeat superior liability, that argument is both factually and legally flawed. From a factual standpoint,

---

[18] McGarry dismisses this inability to cross-examine by asserting that any unfairness to Pastoor should be ignored because, having chosen to defame McGarry off the record, Pastoor cannot be heard to complain he is hamstrung in his ability to cross-examine the reporters. However, this argument assumes the disputed issue, i.e., that it *was* Pastoor (rather than some other person for whom he would have no responsibility, see *Murray v. Bailey* (N.D.Cal. 1985) 613 F.Supp. 1276, 1281) who uttered the defamatory statements. Pastoor has denied that fact, and McGarry cannot deprive Pastoor of his right to cross-examine by assuming away the question to be decided.

it is impossible to distinguish which statements were obtained from alleged "[U]niversity officials" and which statements were obtained from another of the "several sources at the school" (see fn. 15) who might or might not be a person for whom University would be liable under respondeat superior principles. For example, a football player who might have witnessed the football-kicking incident, or a student who might have become aware of the reasons for the termination because she was interning in the human resources department, would qualify as a "source[] at the school" who uttered the defamatory statements but would not be a person for whom University would be liable under respondeat superior principles. Moreover, even assuming the article used the term "sources" as a synonym for persons it had previously characterized as "[U]niversity officials," McGarry cites nothing to suggest a conclusory averment by a reporter that the source was an "official" constitutes competent evidence the speaker was in fact an official authorized to speak on behalf of University.[19]

Second, even assuming McGarry could meet one element of respondeat superior liability, based solely on the reporters' opinion the unidentified speaker was *a* University official, McGarry cannot demonstrate constitutional malice unless he can also show the unidentified speaker subjectively knew the statements were false or spoke with reckless disregard of their falsity. Absent clear and convincing evidence identifying the precise individual who spoke the defamatory statements, and therefore whose "state of mind" is at issue, McGarry cannot show a likelihood of success on the malice element of his defamation claim against University.

For these reasons, we conclude the refusal to compel the reporters' deposition does not require reversal of the order striking McGarry's defamation claim against University because the testimony would not have satisfied McGarry's anti-SLAPP burden to show a likelihood of success on his claim against University.

---

[19] McGarry implicitly argues University should be bound by the reporters' characterization of the speaker as a University official. However, introduction of the reporters' testimony would be improper were University simultaneously deprived of the opportunity to cross-examine the reporters to show (1) the speaker was not a University official or (2) the speaker was not acting within the course and scope of his or her employment when the statements were made. Additionally, without a precise identification of the speaker, whom the reporters need not reveal under the Shield Law, University would be precluded from garnering evidence that might show the speaker subjectively believed the statements to be true.

## DISPOSITION

The orders are affirmed. Defendants are entitled to costs on appeal.

Nares, Acting P. J., and Irion, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 14, 2007, S156656.