Filed 12/7/15  McNair v. Nat. Collegiate Athletic Assn. CA2/3
Published opinion filed in this case on 2/6/15

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| TODD McNAIR, | B245475 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC462891) |
| v. |  |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, |  |
| Defendant and Appellant. |  |

APPEAL from a judgment of the Superior Court of Los Angeles County, Frederick Shaller, Judge.  Affirmed in part, reversed in part.

Loeb & Loeb, Michael L. Mallow, Laura A. Wytsma and Meredith J. Siller for Defendant and Appellant.

Greene, Broillet & Wheeler, Bruce A. Broillet, Scott H. Carr; Esner, Chang & Boyer and Stuart B. Esner for Plaintiff and Respondent.

## INTRODUCTION

Plaintiff Todd McNair, formerly an assistant coach of the University of Southern California (USC) football team, sued the National Collegiate Athletic Association (the NCAA) after the NCAA published the results of its investigation into whether former student-athlete Reggie Bush received improper benefits while he was at USC. The NCAA appeals from the order denying its special motion to strike the complaint under the anti-SLAPP statute. (Code Civ. Proc., § 425.16.)[1] We hold that McNair has demonstrated a probability of prevailing on the merits of his defamation causes of action but not on his interference with contract and economic advantage causes of action. We further hold that McNair's negligence, contract, and declaratory relief causes of action do not arise from protected activity. Accordingly, we affirm the judgment in part and reverse it in part.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

We consider the evidence according to the applicable rules of review. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811 820.)

1. *The parties*

The NCAA is a "voluntary organization composed of approximately 1,200 colleges, universities, and other educational institutions throughout the United States. Its purpose is ' "to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and by so doing, retain a clear line of demarcation between college athletics and professional sports." ' Toward that end, the NCAA adopted a constitution, bylaws, and regulations. One of the ways it

---

[1] SLAPP is the acronym for "strategic lawsuit against public participation." (*Equilon Enterprises v. Consumer Cause, Inc*. (2002) 29 Cal.4th 53, 57.)

All further statutory references are to the Code of Civil Procedure, unless otherwise noted.

[2] In an earlier published opinion, we held that the NCAA failed to demonstrate why the record in this case should be sealed. (*McNair v. National Collegiate Athletic Assn.* (2015) 234 Cal.App.4th 25.) This opinion addresses the substantive merits of the appeal.

accomplishes its purpose is by enforcing its rules and regulations.  Member institutions, their employees, student athletes, and alumni agree to comply with the rules and regulations and to submit to the NCAA's rule-enforcement process." (*McNair v. National Collegiate Athletic Assn.*, *supra*, 234 Cal.App.4th at pp. 28-29.)

Under the enforcement process, when an alleged rule violation is reported to the NCAA, enforcement investigators attempt to interview everyone who may have knowledge of the alleged violation.  If the enforcement staff concludes there is sufficient information indicating that NCAA rules have been violated, it provides the institution with a notice of allegations.  The institution may file a response explaining its position.  After a prehearing conference, the enforcement staff prepares and submits a case summary to the Committee on Infractions (the COI).  The COI holds a hearing after which it deliberates in private.  (NCAA Bylaw, § 32.8.8 (Bylaw).)  The COI's findings and penalties are set forth in an infractions report.  Any appeal of COI determinations is heard by the NCAA Infractions Appeals Committee (the Appeals Committee).  (Bylaw, § 32.10.1.)  The NCAA's bylaws require that the COI and Appeals Committee reports "be made available to the national wire services and other media outlets."  (Bylaw, § 32.9.2.)

McNair was an assistant football coach at USC during the time that Bush was a running back on the school's football team.  Prior to that, McNair played professional football for eight years.

2. *The investigation*

When Bush was in his third year of college, the NCAA received information indicating that he may have violated NCAA rules while a student at USC.  The NCAA undertook an investigation in 2006.

The NCAA's enforcement division received information that Lloyd Lake, a convicted felon, and his associate Michael Michaels, among others, formed a sports agency and began providing Bush and his parents with cash and other improper benefits in exchange for Bush's promise to sign with Lake's agency when he began playing professional football (the agency agreement).  Such benefits and agency agreements

3

violate NCAA rules.  In September 2009, the NCAA issued a notice of allegations to USC.

The notice of allegations charged McNair with unethical conduct in that "McNair knew or should have known that Bush, Lake and Michaels were engaged in possible violations."  As evidence, the notice cited a two-minute 23-second telephone call on January 8, 2006 at 1:34 a.m., between Lake and McNair, during which Lake allegedly asked McNair to intercede with Bush and convince the student to adhere to the agency agreement (the two-minute call).

At the close of the enforcement process, on June 10, 2010, the COI issued its 67-page official infractions report containing numerous findings and imposing significant sanctions against USC's football program (the COI report).  With particular respect to McNair, referred to as "assistant football coach" in the COI report, the NCAA found that he committed unethical conduct in violation of NCAA legislation and imposed sanctions on him that, inter alia, (1) prohibited him from engaging in recruiting activities or interacting with prospective student-athletes; and (2) required any institution that employed McNair during the penalty period to report to the COI about the institution's responsibility to monitor McNair's compliance and to affirm at the close of the period that he had complied with the penalties.

3. *The operative statement*

Of relevance to this appeal are five pages in the COI report discussing McNair. The operative, allegedly false and defamatory statement contained in the COI report is found in two paragraphs and reads:

"At least by January 8, 2006 [McNair] *had knowledge* that [Bush] and [Lake and Michaels] likely were engaged in NCAA violations.  At 1:34 a.m. he had a telephone conversation for two minutes and 23 seconds with [Lake] during which [Lake] attempted to get [McNair] to convince [Bush] either to adhere to the agency agreement or reimburse [Lake and Michaels] for money provided to [Bush] and his family.  Further during his September 19, 2006 and February 15, 2008, interviews with the enforcement staff, [McNair] violated NCAA ethical conduct legislation by providing false and misleading

4

information *regarding his knowledge of* this telephone call and *the NCAA violations associated with it.* [McNair] failed to alert [USC's] compliance staff of this information and later *attested falsely*, through his signature on a certifying statement, *that he had no knowledge of NCAA violations*." (Italics added.)

There follows a three and a half page discussion of McNair's credibility in asserting that he did not know Lake and Michaels (the three and a half page discussion). Continuing, the operative statement reads: "The [COI] nonetheless remains particularly troubled by the two minute and 32 second telephone call from [Lake] to [McNair] that took place at 1:34 a.m. on January 8, 2006. [McNair] claimed that he did not remember the phone call and denied [Lake's] description of what was said. The [COI] finds [Lake] credible in his report of the call. [Lake] *said that he phoned* [McNair] *to ask him to intercede* with [Bush] and get him to adhere to the agency agreement that he made with [Lake and Michaels]. [Lake] said he also told [McNair] that he did not intend to lose the money he had given [Bush] and his parents and preferred not to go public with the matter and implicate the institution."[3] (Italics added.)

4. *The interviews upon which the COI relied*

It is undisputed that Lake called McNair on January 8, 2006. The NCAA enforcement staff's Rich Johanningmeier and Angie Cretors interviewed Lake in November 2007. The following portion of Lake's interview, not included in the COI report, is the support for the NCAA's findings against McNair:

"RJ: Well let me ask you this one, too, Lloyd, on uh, January 8, 2006, at 1:34 in the morning, there's a call, *McNair . . . to you* for two minutes and 32 seconds.

"LL: What time was that?

"RJ: This is January 8, 2006, [its] at 1:34 in the morning, and [its] a call, uh, McNair—

---

[3] The report concludes that the COI found "it implausible that [McNair] would have stayed on the phone for that length of time in the middle of the night with a person he claimed not to know" and "it was possible, if not likely" that Lake called McNair to discuss the agency agreement.

5

"[¶] . . . [¶]

"RJ:  -- *McNair makes a call to you* at 2:32. . . .

"[¶] . . . [¶]

"LL:  *I think* that was like, that was like *him* trying to resolve it, you know, and like [Bush is] wrong, he should make it right and basically don't implement [*sic*] the school.

"RJ:  Because this, this is 2006 we're talking about.

"LL:  Yeah, that's when I went to jail, that's when everything started falling apart, I mean it fell apart.

"RJ:  What can you tell us that you specifically recall about that conversation with him?

"LL:  *Uh, just telling about [Bush] and all, he knew about the money he took, he knew that he had an agreement and –*

"AC:  [McNair] *indicated to you in the telephone conversation that he was aware that [Bush] took money –*

"LL:  I mean, *he knew --*

"AC:  *-- from you*?

"LL:  *-- yeah bec* [sic]*, he knew* [Bush] took money from me.  *There's no doubt he knew about that*.

"RJ:  And why do you say that?

"AC:  Yeah, we need to know why you, why you believe that [McNair] knew that?

"LL:  '*Cause he was around a lot* and, you know, [its] like *he watched* me get them guys, his friends, hotel rooms, [Bush] *told me he knew* about certain things he was doing but he's cool.  You know what I mean?  [Its] *like basically through* [*Bush*]." (Italics added.)

"AC:  *So you called McNair in early July and vocalized to him that you wanted your money back*?

"LL:  *January*.

6

"AC:  January of '06?

"LL:  *Yeah*."  (Italics added.)

In an interview of McNair on September 19, 2006, the following occurred:

"AC:  Have you ever spoken with Michael Michaels?

"TM:  Not to my knowledge.

"AC:  Have you ever met Lloyd Lake?

"TM:  Not to my knowledge.

"AC:  So you might have but you're not sure and you might not have . . . .

"TM:  *Not sure*.

"[¶] . . . [¶]

"TM:  *I don't recall* ever meeting them.

"NR:  Okay.  Or was that speaking with him?

 "TM:  Never.

"AC:  With either Lake or Michaels?

"TM:  Never."  (Italics added.)


A second interview of McNair in February 2008 about the two-minute call reads:

"RJ:  Okay.  This is January *2005*.  According to your telephone records, on Saturday, January 8th, *2005*, you had a two minute and 32, uh, second telephone conversation with that same . . . number . . . .  Tell us about that?

"TM:  I have no idea.  I don't recognize that number."  (Italics added.)

Shortly thereafter,

"TM:  Anyway.  So I don't know Lloyd Lake.

"RJ:  Okay.

"TM:  *I've never spoken to Lloyd Lake*."  (Italics added.)


The telephone records indicate that no call occurred on January 8, *2005*; the call in question occurred on January 8, *2006*.  The COI report also cites an interview with Lake's girlfriend.  Nowhere in the COI or Appeals Committee reports is there any

7

evidence, other than Lake's quoted interview, that Bush told McNair about the agency agreement or improper benefits. Hence, the interviews about the two-minute call appear to be the sole basis for the NCAA's finding that McNair knew about the NCAA violations.

5. *The COI report's three and a half page discussion about McNair's credibility*

As noted, the COI report acknowledges that USC, McNair, and the enforcement staff disagreed about the facts underlying the finding against McNair. Over the course of three and a half pages, the COI report recites that McNair claimed there was no proof that he knew or met Lake or Michaels, that he knowingly gave false information to the enforcement staff, or that he lied when he denied that Bush told him about the agency agreement and improper benefits. The report then explains the reasons the COI did not believe McNair and instead found Lake to be "credible in his report of the [two-minute] call." First, the COI report describes a March 2005 party in San Diego at which McNair "alleged[ly]" met Lake and learned about the agency and benefits. Yet, the COI concludes in its report that the March 2005 party does not support the finding against McNair and notes "unresolved discrepancies in what witnesses reported" about the party. The second proffered "reason to question [McNair's] credibility in denying that he *knew* [*Lake*]" was that actor Faizon Love was friends with both McNair and Lake. (Italics added.) The COI report cited a photograph of the three and Michaels. The report then acknowledges that McNair stated that of the three, he knew Love only, and that it was not uncommon for others to pose for photographs with celebrities. The third basis given for McNair's "lack of credibility" was an October 2005 recruiting event, during which Lake, Bush, and McNair were in the same location and a series of calls to Lake were made from McNair's phone. These events were recited as support for the COI's conclusion that McNair lied in his interview when he insisted that he did not know Lake.

6. *The COI deliberations before issuing the COI report*

The COI typically consists of athletic directors, athletic-conference commissioners, faculty athletic representatives, judges, attorneys, and professors, who serve voluntarily and not as employees of the NCAA. Only the voting COI members

8

may deliberate in a particular enforcement proceeding. The NCAA bylaws require that the COI "shall excuse all others from the hearing, and the [COI] shall make its determinations of fact and violation *in private*." (Bylaw 32.8.8, italics added.) At the time of the USC investigation, it was against proper procedure and policy, and would be inappropriate, for nonmembers, nonvoting observers, or the Coordinator of Appeals, to participate in, or express an opinion about, deliberations of the voting members of a particular committee. As COI liaison Shepard Cooper stated, "[I]f you're not a member of the [COI], then you're not part of the decision process."

The COI hearing in the USC investigation took more than 30 hours over three days. The COI had difficulty reaching a determination about McNair. One member described the enforcement staff's interview of McNair as "botched," because McNair "did not have a good opportunity to explain the call, . . . ." Another member expressed reservations about "mak[ing] the finding when there is no allegation that [McNair] personally was involved in any rules violations, *or even had specific knowledge of any*." (Italics added.) That same member explained that "on most issues it was [McNair's] word against Lake's word. And, Lake's transcript was really choppy on his relationship with McNair, and as I recall he had difficulty being able to come up with his name until staff prompted him . . . . [¶] He may have not told the truth about knowing Lake, but the real question would seem whether he knew of Lake's plan . . . ." A *nonvoting member* offered that the "staff . . . has seemed to have fallen short with this investigation . . . ." Although the NCAA considered re-interviewing McNair using the correct date of January 8, 2006 instead of 2005, ultimately the decision was made not to.

Roscoe Howard was strictly an observer of the COI's USC proceedings. As an observer, "policy" prevented him from "directly participat[ing] in the adjudication of cases." As such, he was "not part of the decision process" in the USC case, and it "would not be appropriate in that sense for someone hypothetically to attempt to influence." Nonetheless, Howard spoke in the deliberations. Howard also sent a four and a half page e-mail to members of the COI strongly voicing his position about what should be done with respect to McNair, stating that McNair "should have all inferences negatively

9

inferred against him. . . ." Included in this e-mail were references to a Los Angeles Times article and other information from outside the record alluding to criminal events in McNair's past. The COI allowed Howard to participate in, and express his strong opinions during, deliberations despite policy that prohibited this conduct.

While the COI was unable to reach a consensus on McNair, Rodney Uphoff, the NCAA's Coordinator of Appeals who could attend deliberations but not participate or express an opinion, e-mailed Cooper, who served as a support staff liaison to the COI and not as a participant in deliberations or as a voting member. Uphoff's e-mail told Cooper, "Obviously this email is only going to you. I haven't been able to sleep for 3 nights because I fear that the committee is going to be too lenient on USC on the football violations. I think that would be a huge mistake in light of the evidence against Bush. It is incredible to think that he wasn't involved from the start. [Howard] and I both are concerned because the evidence in our view is overwhelming that he was involved in 2004 and we are surprised at the very level of proof demanded by some of the committee members. *I am working on a long memo summarizing the evidence* . . . ." (Italics added.) Cooper responded by quoting *Howard's statements made "during . . . deliberations"* about McNair's character, that "individuals like McNair shouldn't be coaching, at ANY level . . . . He's a lying morally bankrupt criminal, in my view, and a hypocrite of the highest order." (Italics added.)

After more deliberations, a COI member requested additional discussion about McNair. Later that day, Uphoff sent an e-mail to Cooper to "encourage" him "to respond that you are writing something up and we will schedule another meeting after the draft. We are not going to achieve consensus re mcnair no matter how many calls we have and we are going over ground that we already have discussed. We will ultimately have to take a vote and hopefully it will come out the right way."

Neither McNair nor his attorney were made aware of these emails or given an opportunity to respond to them. During his deposition in this lawsuit, Johanningmeier acknowledged that the NCAA would need evidence that a USC employee knew of the improper benefits to sanction USC for Bush's receipt of those benefits.

10

The COI sent its draft report to the enforcement staff to check facts such as dates, names, titles, but not to refine the substantive findings. The enforcement staff approved the draft report as released.

In an interview conducted on June 10, 2010 when the report was released to the public, Paul Dee, chair of the COI stated, "There was also knowledge of possible violations by a member of the coaching staff which apparently was not reported."

McNair's 37-page brief to the Appeals Committee contained a point-by-point explanation of how the COI's findings in support of its unethical conduct determination against McNair, as set forth in the operative statement, were false, unsupported by the record, and resulted from procedural error. On April 29, 2011, the Appeals Committee issued its report denying McNair's appeal.

7. *The complaint*

McNair's ensuing complaint alleged that he suffered damage to his reputation and career because USC did not renew his contract. The operative complaint asserted causes of action for damages on the theories that: the NCAA defamed him by publishing the COI and Appeals Committee reports (libel), and by three oral statements Paul Dee made and one NCAA chairman Mark Emmert made (slander); interfered with McNair's prospective economic advantage, and with his contractual relations; breached its contract with USC, of which McNair is a third party beneficiary; and was negligent. McNair also sought declaratory relief.

8. *The NCAA's special motion to strike*

The NCAA filed its special motion to strike on the grounds that the COI and Appeals reports were conduct in furtherance of protected activity and so fell within the purview of the anti-SLAPP statute. (§ 425.16.) As for the remaining five nondefamation causes of action, the NCAA urged that they all arose from the same injury, namely damage to McNair's career as the result of the COI and Appeals Committee reports and should be stricken as protected activity. Finally, the NCAA asserted that McNair was incapable of prevailing on the merits of all seven causes of action because the NCAA's statements were not false, were nonactionable opinion, and were made without malice.

11

9. *McNair's opposition to the special motion to strike*

After conducting limited discovery, McNair responded that his causes of action were premised on the false statements about who made the call and what transpired during that call that led to the NCAA to conclude that *McNair knew* of the agency agreement and improper benefits and engaged in unethical conduct by failing to report them and lying to investigators. The reports were not protected opinion, McNair asserted, because the NCAA manufactured and distorted facts to support its predetermined conclusion about him. McNair submitted his declaration, made under penalty of perjury, in which he asserted that "[a]t no time did I engage in any acts of unethical conduct" and "I had absolutely no knowledge that either Reggie Bush or any member of his family was receiving any improper benefits or money from Lloyd Lake . . . or any other agent . . . ." He asserted he did not "recall ever receiving a telephone call from Lake. I often received calls from people, some that I knew and some that I did not know, looking for Reggie Bush. However, I am absolutely certain that at no point did I ever discuss with Lake anything related to alleged improper benefits or money received by Reggie Bush and/or any member of his family." He declared the statement in the COI report was "patently false" that " 'At least by January 8, 2006, [McNair] had knowledge' " that Bush and Lake were engaged in NCAA violations. McNair also explained that he has been unable to obtain work as a college football coach as the direct result of the false statements made in the COI report and the sanctions.

10. *The NCAA's reply*

Asserting that "*most* of the facts disclosed in the [COI] report are true," the NCAA replied that McNair did not provide admissible evidence to show his likelihood of prevailing on each of his seven causes of action. (Italics added.) The NCAA argued that the COI report represented opinion about McNair's credibility, and that the report was protected by the common interest privilege (Civ. Code, § 47, subd. (c)).

12

11. *The ruling*

The trial court denied the special motion to strike. The court found the only causes of action arising from protected activity and subject to the anti-SLAPP procedure were those alleging defamation, and that McNair had shown a probability of prevailing on the merits. The court found that McNair had presented admissible evidence showing the COI report contained false statements. The court found that McNair was a limited public figure, but had demonstrated actual malice and so the common-interest privilege did not apply. The NCAA's timely appeal ensued.

## CONTENTIONS

The NCAA contends that McNair failed to demonstrate a likelihood of prevailing on the merits of his libel cause of action; the trial court erred in failing to address the slander cause of action, and in ruling that the nondefamation causes of action did not arise from protected activity.

## DISCUSSION

1. *General principles and standard of appellate review of a special motion to strike (§ 425.16)*

"A special motion to strike involves a two-step process. First, the defendant must make a prima facie showing that the plaintiff's 'cause of action . . . aris[es] from' an act by the defendant 'in furtherance of the [defendant's] right of petition or free speech . . . in connection with a public issue.' (§ 425.16, subd. (b)(1).) If a defendant meets this threshold showing, the cause of action shall be stricken unless the plaintiff can establish 'a probability that the plaintiff will prevail on the claim.' [Citation.]" (*Simpson Strong–Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21, fn. omitted.)

Analysis of the first prong focuses on the substance of the lawsuit. "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.]" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78.) "The 'principal thrust or gravamen' of the claim determines whether section 425.16 applies." (*Mann v. Quality Old Time Service, Inc*. (2004) 120 Cal.App.4th

13

90, 103.)  To resolve the issue, we look to the allegations in the complaint and affidavits.  (§ 425.16, subd. (b)(2).)

Notwithstanding the anti-SLAPP statute must be construed broadly (*Martinez v. Metabolife Internat., Inc*. (2003) 113 Cal.App.4th 181, 187), its boundaries are not limitless.  "[A] defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant.  [Citation.] . . . [W]hen the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute."  (*Id*. at p. 188.)  "That a cause of action arguably may have been *triggered* by protected activity does not entail that it is one arising from such."  (*City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 78, italics added.)  "[T]he critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech."  (*Ibid*.)

If a defendant makes the requisite showing, the burden shifts to the second step of the anti-SLAPP analysis, namely to a determination of whether the plaintiff demonstrated a probability that he or she will prevail on the merits.  The "plaintiff's burden of establishing a probability of prevailing is not high."  (*Overstock.com, Inc. v. Gradient Analytics, Inc*. (2007) 151 Cal.App.4th 688, 699.)  "The plaintiff need only establish that his or her claim has *minimal* merit to avoid being stricken as a SLAPP.  [Citation.]"  (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 735, italics added.)  There is no requirement that the plaintiff " '*prove* the specified claim to the trial court'; rather, so as to not deprive the plaintiff of a jury trial, the appropriate inquiry is whether the plaintiff has stated and substantiated a legally sufficient claim."  (*Mann v. Quality Old Time Service, Inc*., *supra*, 120 Cal.App.4th at p. 105.)  Toward that end, the plaintiff must adduce evidence that would be admissible at trial, and cannot simply rely on his or her pleadings, even if verified.  (*Hailstone v. Martinez*, *supra*, at p. 735.)  "[D]eclarations that lack foundation or personal knowledge, or that are argumentative, speculative, impermissible opinion, hearsay, or conclusory are to be disregarded.  [Citation.]"

14

(*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 26.)  Thus, " 'the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88-89.)

Our review of "an order granting or denying a motion to strike under section 425.16 [is] de novo.  [Citation.]" (*Oasis West Realty, LLC v. Goldman*, *supra*, 51 Cal.4th at p. 820.)  " 'We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." ' [Citation.]" (*Oasis West Realty, LLC v. Goldman*, at p. 820.)

a. *The Defamation Causes of Action*

The parties do not dispute that McNair's defamation claims, the first and second causes of action for libel and slander respectively, arise from activity protected by section 425.16, subdivision (b)(1).  Therefore, the only question before us with respect to these causes of action is whether McNair established a probability of prevailing on the merits.

(i) *No error in denying the NCAA's special motion to strike the libel cause of action*

In its anti-SLAPP motion and on appeal, the NCAA focuses on the operative statement contained in the published COI report that McNair knew about the agency agreement and improper benefits and violated NCAA ethical conduct legislation by providing false and misleading information to the enforcement staff about his knowledge of Lake's activities and of the two-minute call, failing to alert USC about the NCAA rules violations, and later attesting falsely that he had no knowledge of them.

Libel is a "false and unprivileged publication by writing, printing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be

15

shunned or avoided, or which has a tendency to injure him in his occupation." (Civ. Code, § 45.)

" ' "The *sine qua non* of recovery for defamation . . . is the existence of a falsehood." [Citation.]' " (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1048.) "To state a defamation claim that survives a First Amendment challenge . . . [the] plaintiff must present evidence of a statement of fact that is 'provably false.' [Citations.] ' "Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot ' "reasonably [be] interpreted as stating actual facts" about an individual.' [Citations.] Thus, 'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of . . . contempt,' and language used 'in a loose, figurative sense' have all been accorded constitutional protection. [Citations.]" [Citation.] The dispositive question . . . is whether a reasonable trier of fact could conclude that the published statements imply a provably false factual assertion. [Citation.]' [Citation.]" (*Id*. at p. 1048.)

"To ascertain whether the statements in question are provably false factual assertions, courts consider the ' " 'totality of the circumstances.' " ' [Citation.]" (*Nygard, Inc. v. Uusi-Kerttula, supra,* 159 Cal.App.4th at p. 1049.) " ' "First, the language of the statement is examined. For words to be defamatory, they must be understood in a defamatory sense . . . . [¶] Next, the context in which the statement was made must be considered. . . . [¶] This contextual analysis demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed." ' [Citations.]" (*Seelig v. Infinity Broadcasting Corp*. (2002) 97 Cal.App.4th 798, 809-810.) " 'Whether a statement declares or implies a provably false assertion of fact is a question of law for the court to decide [citations], unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood.' " (*Ruiz v. Harbor View Community Assn*. (2005) 134 Cal.App.4th 1456, 1471.)

16

The NCAA contends that McNair has not shown that he is likely to prevail on the merits because the "*facts* disclosed in the [operative statement] are *true*." (Second italics added.) The NCAA focuses on the two-minute call and argues that Lake never claimed that McNair called him; rather Lake confirmed that he called McNair in January 2006. Contrary to the NCAA's insistence, the issue is not whether the operative statement truthfully reflects who initiated the two-minute call.

Based on McNair's complaint, the issue centers on whether the COI report's operative statement falsely states that McNair "*had knowledge*" of the agency agreement and improper benefits and hence acted unethically and dishonestly under NCAA legislation by lying about that knowledge and failing to report that knowledge to USC. McNair presented admissible evidence, which if credited by a jury, indicates that he did not know about the NCAA violations, in which case the operative statement is susceptible of a false meaning. McNair stated in his declaration that the operative statement was false. His declaration flatly denied he had any knowledge of, and denied he ever discussed improper benefits with Lake. If this declaration is credited, McNair did not know about the NCAA violations and thus did not violate NCAA ethical conduct legislation. As noted, the two-minute call appears to be the sole basis for the NCAA's ethics-violation finding against McNair. Yet, a jury could reasonably conclude that Lake's interview did not support the statement that McNair knew about the NCAA violations. Lake appeared to be confused when questioned about his relationship with McNair. Lake accepted that McNair called him. Although Lake said in his interview that McNair "knew about the money [Bush] took, he knew that [Bush] had an [agency] agreement," when pressed by the interviewers, Lake made clear that this was Lake's own assumption. Nowhere during Lake's description of the two-minute call did Lake ever say that he informed McNair of, or that McNair claimed knowledge about, the agency agreement and improper benefits. Instead, Lake *speculated* that Bush told McNair, or that McNair knew from osmosis because "he was around a lot" and "watched." Lake's later statement that he called McNair to get his money back only creates a factual dispute but does not defeat McNair's evidence as a matter of law. (*Oasis West Realty, LLC v.*

17

*Goldman*, *supra*, 51 Cal.4th at p. 820.)  In sum, McNair has demonstrated prima facie that the operative statement could reasonably be interpreted as implying a provably false assertion of fact.[4]

If a jury concludes the statement is false, this operative statement would be defamatory.  The NCAA argues that the description of Lake's statement is not defamatory because it does not expose McNair to " 'hatred, contempt, ridicule, or obloquy' " or " 'injure him in his occupation.' " (Civ. Code, § 45.)  To the contrary, the operative statement served as the support for the COI finding that McNair *knew* about the rules violations and hence engaged in dishonest and unethical conduct *in his occupation* by failing to report his knowledge to USC and lying about it during the NCAA investigation.  McNair declared he had been unable to find another job as a college football coach.

The NCAA next argues that the operative statement's clause that McNair "violated NCAA ethical conduct legislation by providing false and misleading information regarding his *knowledge of this telephone call . . .*" constitutes an opinion based on disclosed facts that are true.  (Italics added.)  The NCAA observes that the record gave it ample reason to question McNair's credibility when he denied ever knowing or speaking to Lake.  The NCAA cites McNair's interviews in which he twice claimed he never spoke to Lake and the COI report's three and a half page discussion of McNair's denials, the San Diego party, the photograph, reference to telephone records, and the recruiting event.  This evidence, the NCAA argues, disclosed the information on which the NCAA relied and its reason for believing Lake over McNair, with the result that its "findings are merely its own opinions."

"An opinion or legal conclusion is actionable only ' "if it could reasonably be understood as declaring or implying actual facts capable of being proved true or false." ' [Citation.]  Thus, an opinion based on implied, undisclosed facts is actionable if the

---

[4]    Lake also indicated that he called McNair a couple of times after January 8, 2006.  However, as the trial court accurately observed, although the other calls may have occurred, "it is the substance of the 1/8/06 conversation that is at issue . . . ."

18

speaker has no factual basis for the opinion. [Citation.] An opinion is not actionable if it discloses all the statements of fact on which the opinion is based and those statements are true. [Citation.] An opinion is actionable if it discloses all the statements of fact on which the opinion is based and those statements are false. [Citation.] In determining whether a statement is actionable opinion, we examine the totality of the circumstances, starting with the language of the allegedly defamatory statement itself. [Citation.]" (*Ruiz v. Harbor View Community Assn.*, *supra*, 134 Cal.App.4th at p. 1471.)

Even assuming the three and a half page discussion and the NCAA's conclusion that Lake was more *credible* than McNair constitutes opinion based on disclosed facts, this credibility opinion is not the asserted defamatory statement, and McNair's defamation causes of action are not premised on the finding he lied about simply meeting or speaking to Lake. The defamatory publication is the operative statement's recitation that McNair *knew* about the NCAA rules violations and lied about that knowledge. Yet, this conclusion is based on the interviews of Lake and McNair about the two-minute call, which interviews were not disclosed. Furthermore, the operative statement was the justification for the serious sanctions against McNair, and common sense tells us that a sanction is more than a simple opinion. In sum, a reasonable factfinder could conclude that the published statement declares a provably false assertion of fact and not opinion with the result that McNair has established a probability of prevailing on the merits of his libel cause of action.

(ii) *No error in denying the NCAA's special motion to strike the slander cause of action*

"Slander is a form of defamation (Civ. Code, § 44), consisting of a false and unprivileged oral publication (Civ. Code, § 46). To establish a prima facie case for slander, a plaintiff must demonstrate an oral publication to third persons of specified false matter that has a natural tendency to injure or that causes special damage. [Citation.]" (*Mann v. Quality Old Time Service, Inc.*, *supra*, 120 Cal.App.4th at p. 106.)

McNair's second cause of action is for damages for slander based on five allegedly false, oral statements made to news media by agents of the NCAA: four by

19

Paul Dee and one by Mark Emmert. The trial court did not address these utterances in the statement of decision. In its appeal, the NCAA contends that the trial court erred in failing to dismiss the slander cause of action. The NCAA's motion attacked a fifth of the allegedly false statements enumerated in McNair's complaint on the ground, assuming McNair could prove the statement was made, that it was not provably false and was too vague to be taken as fact. McNair counters by suggesting that the NCAA waived this contention because its special motion to strike only discussed one of the five allegedly slanderous statements.

We review a special motion to strike independently. (*Oasis West Realty, LLC v. Goldman*, *supra*, 51 Cal.4th at p. 820.) Accordingly, we must address the slander cause of action. There is no dispute that all four oral statements listed in the complaint arise from protected activity. (§ 425.16.) Shifting our review to McNair's showing, it demonstrated a probability of prevailing on the merits of this cause of action. His opposition to the anti-SLAPP motion cited to competent, admissible evidence, namely exhibit 24, which is a 10-page interview given by Paul Dee to the news media on June 10, 2010. A fair reading of that interview indicates that, while Dee did not cite McNair by name, he repeated the results of the COI investigation. Dee states that there was "knowledge of possible violations by a member of the coaching staff which apparently was not reported," and that "[t]he assistant football coach failed to report information to the compliance staff regarding potential NCAA violations related to the activities of [Lake and Michaels]. He also attested falsely that he had no knowledge of NCAA violations. His conduct impeded the institution from fulfilling its . . . obligation under the NCAA bylaws. His conduct also resulted in findings that he violated NCAA unethical conduct legislation by providing these statements." In making these oral statements, Dee republished to a new audience statements from the COI report, which statements we have concluded could be understood by a reasonable factfinder to assert a provably false statement of fact. (*Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1243.) Accordingly, McNair showed a probability of prevailing on the merits of his slander cause of action.

20

(iii) *McNair has demonstrated a likelihood of proving actual malice*.

The trial court ruled that McNair is a limited purpose public figure and therefore could only recover defamation damages if he showed actual malice. McNair disputes this finding.[5]

A " 'limited purpose' or 'vortex' public figure, [is] an individual who 'voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.' [Citation.] . . . [T]he 'limited purpose' public figure loses certain protection for his reputation only to the extent that the allegedly defamatory communication relates to his role in a public controversy." (*Reader's Digest*, *supra*, 37 Cal.3d at pp. 253-254.)

"Numerous courts . . . have concluded professional and collegiate athletes and coaches are at least limited purpose public figures. [Citations.]" (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 115 (*McGarry*).) " '[A] common thread in these cases is that one's voluntary decision to pursue a career in sports, whether as an athlete or a coach, "invites attention and comment" regarding his job performance and thus constitutes an assumption of the risk of negative publicity.' [Citation.]" (*Ibid.*, quoting from *Barry v. Time, Inc*. (N.D.Cal. 1984) 584 F.Supp. 1110, 1118-1119.) The court in *McGarry* held that a college football coach was a limited public figure for purposes of his libel action alleging he was defamed in a newspaper article published two days after his employment was terminated reporting on the reasons for his termination. (*McGarry, supra*, at pp. 102-103.) The *McGarry* court explained that McGarry "voluntarily entered the public arena as a college football coach, and the statements dealt

---

[5] The NCAA argued in it special motion to strike that McNair was a limited public figure. On appeal the NCAA argues he is a public figure, but concedes in its reply brief that "McNair is a limited public figure under the 'totality of the circumstances.' [Citation.]" The determination of whether a plaintiff is a public figure is a legal question. (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 254-255 (*Reader's Digest*).) We need not independently assess whether McNair is a public figure as opposed to a public figure for limited purposes because under either scenario he had the burden to demonstrate the probability he could prove actual malice to defeat a special motion to strike.

21

exclusively with his performance of the public role he voluntarily undertook." (*Id*. at p. 115.)

Likewise, McNair, who was a professional athlete for years, took the job as assistant football coach at USC, and although he was not a head coach, he accepted the position knowing that the football program at USC was highly publicized, and assumed the risk of publicity, both good and bad, as it related to his public performance. (*Time, Inc. v. Johnston* (4th Cir. 1971) 448 F.2d 378, 380.) The defamatory operative statement dealt exclusively with his performance in the public role which he voluntarily undertook. Therefore McNair was a limited purpose public figure.

Plaintiffs who are limited public figures must show that the publisher made the defamatory statement with malice in its constitutional sense, i.e., " ' "with knowledge that it was false or with reckless disregard of whether it was false or not." ' " (*Reader's Digest*, *supra*, 37 Cal.3d at p. 256.) We apply a subjective test, under which "the defendant's actual belief concerning the truthfulness of the publication is the crucial issue. [Citation.] This test directs attention to the 'defendant's attitude toward the truth or falsity of the material published . . . [not] the defendant's attitude toward the plaintiff.' [Citation.]" (*Id*. at p. 257.) " ' "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." [Citation.]' " (*Christian Research Institute v. Alnor* (2007) 148 Cal.App.4th 71, 90.) "[T]he evidence must 'permit the conclusion that the defendant actually had a "high degree of awareness of . . . probable falsity." [Citation.]' " (*McGarry*, *supra*, 154 Cal.App.4th at p. 114.)

The standard of proof of malice is clear and convincing evidence. That is, the evidence "must be of such a character 'as to command the unhesitating assent of every reasonable mind.' [Citation.]" (*McGarry*, *supra*, 154 Cal.App.4th at p. 114.) "Actual malice cannot be implied and must be proven by direct evidence." (*Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 950.) Factors such as failure to investigate, anger and hostility toward the plaintiff, and reliance on sources known to be unreliable or biased "may, in an appropriate case, indicate that the publisher himself had serious doubts

22

regarding the truth of his publication." (*Reader's Digest*, *supra*, 37 Cal.3d at p. 258.) However, such evidence is relevant only insofar as it reflects on the subjective attitude of the publisher. (*Ibid.*) And, "any one of these factors, standing alone, may be insufficient to prove actual malice or even raise a triable issue of fact. [Citation.]" (*Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1167.)

Also, " '[a]lthough failure to investigate will not alone support a finding of actual malice [citation], the purposeful avoidance of the truth is in a different category.' " [Citation.] '[I]naction,' i.e., failure to investigate, which 'was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the subject] charges' will support a finding of actual malice. [Citation.]" (*Antonovich v. Superior Court* (1991) 234 Cal.App.3d 1041, 1048-1049; *McGarry*, *supra*, 154 Cal.App.4th at p. 114.) Similarly, evidence that the defendant's analysis was designed to arrive at a predetermined conclusion can be sufficient to show actual malice. (*Suzuki Motor Corp. v. Consumers Union of U.S.* (9th Cir. 2003) 330 F.3d 1110, 1135 [summary judgment denied as jury could find by clear and convincing evidence that defendant had high degree of awareness of probable falsity of statements where defendant " 'rigged' the tests to produce" the desired result].)

We apply our independent review to determine whether the plaintiff has "established a probability of demonstrating malice by clear and convincing evidence in opposing an anti-SLAPP motion. [Citations.]" (*Christian Research Institute v. Alnor*, *supra*, 148 Cal.App.4th at p. 86.)

Bearing in mind the higher, clear and convincing standard of proof (*Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 358), we conclude that McNair has carried his burden. First, McNair produced deposition testimony, interview transcripts, and e-mails showing that the COI had difficulty arriving at a consensus about the allegations against McNair. The enforcement staff's interview of McNair was "botched." One COI member was concerned that it was McNair's word against Lake's but that Lake's transcript was "choppy" about his relationship with McNair. Even Howard, a nonvoting member, acknowledged that the investigation "fell short." Notwithstanding McNair's appeal to the

23

Appeals Committee alerting the NCAA to each of the purportedly false statements in the COI report, the report went unchanged. This showing gives rise to a convincing inference that the COI had serious doubts about McNair's knowledge of asserted NCAA violations and nonetheless published the COI report. (*Christian Research Institute v. Alnor*, *supra*, 148 Cal.App.4th at p. 90.)

Second, despite the concerns about the reliability of information gleaned during the interview process; the paucity of evidence that McNair knew about the improper benefits and agency agreement; and the knowledge that Johanningmeier "misspoke on the date" of the two-minute call when questioning McNair, the NCAA made the deliberate decision not to re-interview McNair to clarify the date of the two-minute call and obtain his response. McNair made a sufficiently convincing showing that the NCAA recklessly disregarded the truth when the COI deliberately decided not to correct the investigation's errors or to acquire more information about what McNair knew concerning the rules violations, even after McNair notified the Appeals Committee of the errors.

Third, as Johanningmeier acknowledged in his deposition, without a finding against McNair, no penalties could have been instituted against USC for Bush's receipt of improper benefits. McNair produced evidence that, while the COI had difficulty reaching a conclusion about McNair, it violated its own procedures by considering facts outside the record without affording McNair an opportunity to explain, and by allowing nonvoting members to influence the deliberations. Howard shared with the COI his seriously hostile feelings about McNair in an email that cited facts outside the record. He also expressed his opinions during deliberations. Uphoff encouraged Cooper to do the same to achieve a consensus. Uphoff's e-mail to Cooper revealed that the COI members wanted more proof and so Uphoff was preparing a "long memo," giving rise to the strong inference that he was writing that memo for COI consumption. Likewise, the e-mails suggest that the drafting of the COI report commenced before the COI had reached a consensus. This evidence clearly indicates that the ensuing COI report was worded in disregard of the truth to enable the COI to arrive at a predetermined conclusion that USC

24

employee McNair was aware of the NCAA violations.  To summarize, McNair established a probability that he could show actual malice by clear and convincing evidence based on the COI's doubts about McNair's knowledge, along with its reckless disregard for the truth about his knowledge, and by allowing itself to be influenced by nonmembers to reach a needed conclusion.  (*Christian Research Institute v. Alnor*, *supra*, 148 Cal.App.4th at p. 86.)

On appeal, the NCAA attempts to explain its actions in an effort to present countervailing evidence and undermine McNair's showing of malice by clear and convincing evidence.  For example, NCAA argues it had no reason to interview McNair for a third time after realizing its interviewers utilized the wrong date of the two-minute call when questioning him because he and his attorney had repeated opportunities to explain his position, including during the COI hearing.  Notably, the NCAA did not otherwise cite us to any statements from Bush that he told McNair.  In evaluating a special motion to strike, we must accept the evidence favorable to the plaintiff as true.  We only evaluate the defendant's evidence to determine whether it has defeated that submitted by the plaintiff as a matter of law.  (*Oasis West Realty, LLC v. Goldman*, *supra*, 51 Cal.4th at p. 820.)  This evidence does not defeat that of McNair as a matter of law and does not undermine the strength of McNair's evidence of actual malice.  The issue is not whether McNair lied about ever speaking to Lake.  Such conduct would not justify the extreme sanctions against McNair and USC.  The defamatory statement is that McNair *knew* about the improper benefits and the agency agreement as asserted in the COI report and lied about that knowledge.  As one COI member observed in an e-mail, McNair "may have not told the truth about knowing Lake, *but the real question would seem whether he knew of Lake's plan to have the agency and that he was giving benefits to* [*Bush*]."  (Italics added.)

25

b. *The Nondefamation Causes of Action*

The trial court ruled that the remaining causes of action in McNair's complaint did not arise from protected activity and hence were not subject to the special motion to strike. The NCAA contends this ruling was error. We address these causes of action serially.

(i) *The interference with prospective economic advantage and contractual relations causes of action arise from protected activity and McNair has not demonstrated a prima facie case*.

McNair alleges the NCAA interfered with his employment contract with USC by, inter alia, "inappropriately labeling [him] as unethical." As damages, McNair alleges that USC did not renew his employment contract and he has been unable to find work as a college football coach. Thus, these two causes of action arise from protected activity as their gravamen is that the unethical finding in the published COI and Appeals Committee reports caused McNair to lose his position at USC and prevented him from finding another college coaching job.

Turning to whether McNair demonstrated a probability of prevailing, the elements of intentional interference with contract are: " '(1) a valid contract between plaintiff and a third party; (2) defendants' knowledge of the contract; (3) defendants' intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.' [Citation.]" (*Nygard, Inc. v. Uusi-Kerttula*, *supra*, 159 Cal.App.4th at p. 1047.)

McNair does not dispute that his contract with USC had expired by own its terms on June 30, 2010. McNair has not demonstrated an existing contract that the NCAA interrupted. (*Quelimane Co. v. Stewart Title Guaranty Co*. (1998) 19 Cal.4th 26, 55.) Absent an existing contract, McNair cannot demonstrate his likelihood of prevailing on his fourth cause of action.

The same result holds for the cause of action entitled interference with prospective economic advantage. This tort requires that there be an economic relationship between the plaintiff and a third party; with the probability of future economic benefit to the

26

plaintiff; the defendant's knowledge of the relationship; defendant's intentional, wrongful acts designed to disrupt the relationship; actual disruption; and proximately-caused economic harm. (*Korea Supply Co. v. Lockheed Martin Corp*. (2003) 29 Cal.4th 1134, 1153.) The tort " 'protects the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will arise.' [Citation.]" (*Id*. at p. 1164.)

In its special motion to strike, the NCAA argued that McNair failed to demonstrate that it was " 'reasonably certain' that USC would have renewed [his] contract but for the NCAA's unethical conduct finding," given the resignation of USC's head football coach, a new President-elect, the athletic director's termination, and "the unfavorable publicity resulting from the disclosure of McNair's animal cruelty conviction."

McNair responded by pointing to paragraph 16 of his declaration that, "Prior to the decision by USC to not renew [McNair's] contract," Head Football Coach Lane Kiffin told McNair that he "*inten*[*ded*] *to retain*" McNair on his staff, but both Kiffin and USC's Senior Vice President for Administration Todd Dickey informed McNair that USC could not "renew" the contract "due to" the NCAA's findings in the COI report. (Italics added.) The trial court ruled that paragraph 16 of McNair's declaration was hearsay.

We review the trial court's evidentiary rulings in connection with a ruling on an anti-SLAPP motion for abuse of discretion and discern no abuse of discretion. (*Morrow v. Los Angeles Unified School Dist*. (2007) 149 Cal.App.4th 1424, 1444.) McNair argues that paragraph 16 is not hearsay because his declaration's descriptions of the USC officials' statements was admissible evidence of those officials' mental state when they decided not to renew McNair's contract. Not so. Paragraph 16 of McNair's declaration was submitted for the truth of the matter contained therein, i.e., that USC declined to renew McNair's employment contract because of the COI report's ethics findings against him. The trial court did not abuse its discretion in excluding paragraph 16.

McNair also declared that "as a direct result of the false written statements" in the COI and Appeals Committee reports, "including the unethical conduct finding and the [sanction] order, I have been unable to obtain work as a college football coach."

27

Crediting this evidence, as we are required under the rules of review (*Oasis West Realty, LLC v. Goldman*, *supra*, 51 Cal.4th at p. 820), McNair has failed to present a sufficient prima facie showing of facts to demonstrate either that the NCAA knew of college coaching job prospects with which it interfered, or that those prospects were anything other than speculative expectations. McNair has not demonstrated his likelihood of prevailing on his interference with contractual relations and interference with prospective economic advantage causes of action and so they must be stricken. (*Shekhter v. Financial Indemnity Co*. (2001) 89 Cal.App.4th 141, 150 [holding special motion to strike can apply to a single cause of action leaving others for trial].)

(ii) *The breach of contract cause of action does not arise from protected activity.*

McNair's fifth cause of action for breach of contract alleges that the NCAA breached the covenant of good faith and fair dealing contained in its agreement with USC by (1) arbitrarily and capriciously enforcing NCAA rules, (2) denying McNair the opportunity to participate fully in the adjudicatory process, (3) barring McNair and his attorney during questioning of witnesses, and (4) failing to provide McNair with a fair appellate process. This cause of action does not arise from protected activity; it alleges only a garden variety breach of a contract concerning the process. Therefore, the fifth cause of action is not subject to the special motion to strike and so we need not analyze McNair's likelihood of prevailing on this cause of action.

(iii) *The negligence cause of action does not arise from protected activity*.

In assessing whether the negligence cause of action arises from protected activity, we look to the complaint's allegations. (§ 425.16, subd. (b)(2).) McNair's sixth cause of action alleges that "Defendants . . . had a duty to use reasonable care in the manner in which they conducted themselves toward the Plaintiff," and a duty "to refrain from acting in an arbitrary and capricious way in . . . conduct[ing] their investigation." He alleges as the "foreseeable consequence of the manner in which Defendants conducted their investigation," he suffered damages to his career as a college football coach. Therefore, the cause of action was based on the NCAA's investigatory process with the result that

28

the negligence cause of action does not arise from protected activity. (*City of Cotati v. Cashman*, *supra*, 29 Cal.4th at p. 78.)[6]  Thus, we need not analyze McNair's likelihood of prevailing on the negligence cause of action.

> (iv)  *The declaratory relief cause of action does not arise from protected activity.*

Finally, McNair sought a declaration that the NCAA's rules and regulations as written and as applied to McNair be stricken as arbitrary, capricious, and a violation of all notions of fairness and good faith.  This cause of action does not arise from protected activity and hence is not subject to the special motion to strike.  (§ 425.16.)  Therefore, we need not analyze McNair's likelihood of prevailing on this cause of action.

---

[6]  Although McNair also alleges he suffered damages "as a foreseeable consequence of the false and unsupported finding that [McNair] engaged in unethical conduct," this allegation is only incidental to the cause of action, which is based "essentially on nonprotected activity." (*Martinez v. Metabolife Internat., Inc.*, *supra*, 113 Cal.App.4th at p. 188.)  Thus, this allegation does not transform the negligence cause of action into one arising from protected activity.

## DISPOSITION

The judgment of the trial court is reversed with respect to the tortious interference with prospective economic advantage and tortious interference with contractual relations causes of action.  In all other respects, the judgment is affirmed.

McNair is to recover costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

EDMON, P. J.

KITCHING, J.*

---

* Retired Associate Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.