Filed 4/1/26  Vann v. Nunn CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| MOST REVEREND KEVIN WILLIAM VANN et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> SUZANNE NUNN, <br><br> Defendant and Respondent. | G063814, G063845 <br><br> (Super. Ct. No. 30-2020-01164434) <br><br> O P I N I O N |

Appeals from an order of the Superior Court of Orange County, Thomas S. McConville, Judge. Affirmed in part, reversed in part, and remanded with directions. Request for judicial notice denied.

Ross, Wolcott, Teinert & Prout, Andrew G. Prout, Roy Silva and Traci Choi for Plaintiff and Appellant Elizabeth Jensen.

Theodora Oringher, Todd C. Theodora, Andrew B. Breidenbach, Adam G. Wentland and Rina M. Stinson for Plaintiff and Appellant Most Reverend Kevin William Vann.

Dicks & Workman, Joseph G. Dicks, Linda G. Workman; Esner, Chang, Boyer & Murphy, Shea S. Murphy and Kevin K. Nguyen for Defendant and Respondent.

In assessing a special motion to strike under the anti-SLAPP statute (see Code Civ. Proc., § 425.16), "the trial court must engage in a two-step process. 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . [Citation.] If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' ([Citation.] 'Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute.'" (*Edward v. Ellis* (2021) 72 Cal.App.5th 780, 789 (*Edward*).)

This case, currently on its second sojourn in our court, originally came to us on appeal of the trial court's ruling as to the first prong of the above analysis. (*Vann v. Nunn* (Apr. 26, 2023, G060498) [nonpub. opn.].)

The matter arose out of allegedly defamatory statements made by the former interim executive director of the Orange Catholic Foundation (Foundation), Suzanne Nunn, about the Most Reverend Kevin William Vann (Vann), Roman Catholic Bishop for the Roman Catholic Church in the Diocese of Orange (the Diocese),[1] and Elizabeth Jensen, the chief financial officer for the Diocese (collectively, Plaintiffs). A few weeks after Nunn was terminated as interim executive director of the Foundation in 2020, she sent

---

[1] The corporate name for the Diocese is The Roman Catholic Bishop of Orange or RCBO, but we refer to it as the Diocese to maintain uniformity and avoid confusion.

an e-mail to dozens of Catholic foundation leaders across the country suggesting Vann had terminated her and the Foundation board members because she and the Foundation board had refused to allow the unauthorized release of endowment funds to the Diocese.

Plaintiffs filed a complaint against Nunn for defamation. Nunn in turn filed an anti-SLAPP motion to strike the complaint. The trial court concluded the complaint did not arise out of protected activity, and the lawsuit was not a SLAPP. When Nunn appealed that ruling, we disagreed with the court and remanded so the second prong of the analysis could be assessed.

On remand, the trial court granted Nunn's motion, holding Plaintiffs failed to show a probability of prevailing on their claims, as is required on the second prong. Again, we must reverse and remand. A plaintiff is only required to make a minimal showing to meet his or her burden on the second prong. Here, Plaintiffs' showing was more than adequate to defeat the anti-SLAPP motion. The case should therefore proceed on its merits.

STATEMENT OF FACTS

This section is based on the factual summary in our prior opinion,[2] which in turn was based on "the complaint, declarations, and other

---

[2] Plaintiffs request judicial notice of the prior opinion in this case. We need not grant this request because our opinion in the prior appeal provides law of the case to which we adhere in any event. Our prior opinion resolved the first prong of the anti-SLAPP analysis, and no grounds to reconsider its holding have been raised. (See *People v. Nash* (2023) 87 Cal.App.5th 483, 489.) Plaintiffs have also requested judicial notice of a final judgment in a separate case not involving the same parties. We deny the request as the document does not appear relevant to this appeal, and Plaintiffs do not explain why they think it is.

evidence submitted on the special motion to strike." (*Vann v. Nunn, supra,* G060498.) In our prior opinion, we also noted "it is challenging to provide a neutral summary of the facts because the parties present such different versions of what occurred." (*Ibid.*)

"[The Foundation] is a nonprofit fundraising organization . . . formed in 2000 to support the philanthropic and charitable goals of Orange County's Catholic community. [The Foundation] manages millions of dollars in charitable gifts, grants, donations, endowments, and bequests, and it uses those funds to support Catholic charities, ministries, parishes, and schools. Many of [the Foundation]'s donors earmark their donations for specific purposes in their donor agreements, and all [Foundation] funds must be managed and distributed in accordance with those donor agreements and consistent with donor intent.

"[The Foundation] exists in large part to support the Diocese in fulfilling its mission, which includes helping the needy. However, [the Foundation] is fully independent from the Diocese and is governed by an autonomous board of directors . . . , who ensure [the Foundation] is honoring its covenants with its donors.

"[The Foundation]'s sole member is [Vann]. Under [the Foundation]'s bylaws, as the sole member, [Vann] in his discretion may 'remove any member of the [Foundation's] board of directors . . . if that director . . . fails to act in accordance with, or acts in a manner contrary to, the objectives of [the Foundation] set forth in . . . [the Foundation's] bylaws.'

" . . . Nunn is a nonprofit consultant who first joined [the Foundation] in 2010 to assist [its] then executive director, Cindy Bobruk, in developing and implementing a giving and endowment program for [the Foundation]. Among her many duties, Nunn reviewed donor agreements and

4

met with donors to clarify donor intent. Nunn's involvement with [the Foundation] increased in 2015 when Bobruk was diagnosed with cancer and required additional assistance while undergoing treatment.

"After Bobruk passed away in April 2019, the [Foundation] board appointed Nunn to serve as [the Foundation]'s interim executive director. Two of Nunn's primary responsibilities in that position were to assist [the Foundation] with searching for and hiring a permanent executive director, and to develop a strategic plan for [the Foundation]. Over the next year, however, Nunn did not make material progress toward either objective.

"Meanwhile, in March 2020, the COVID-19 pandemic began to take hold, forcing the shutdown of Catholic schools and worship services and prompting a drop in tuition payments and collections for the Diocese. According to Nunn, on March 19, when California's stay-at-home order took effect, . . . Jensen asked [the Foundation] to give the Diocese $12 million from [the Foundation] funds, citing a 30-day working capital deficit at the Diocese. Nunn declined the request and explained that [the Foundation] did not have any undesignated funds. According to Nunn, Jensen replied that [the Foundation] had 'buckets of money.'

"Three days later, Jensen sent a letter to the [Foundation] board's chairman asking [the Foundation] to give the Diocese roughly $2.6 million from endowment funds. In her letter, Jensen explained the funds were needed to cover 'the ever-growing fiscal needs' of certain parishes and schools in light of 'unprecedented times,' while noting all distribution decisions 'should respect the intent of the donors.' Jensen provided additional information about the Diocese's cash flow problems in a follow-up e-mail to the chairman, noting that many parishioners and parents were being asked

5

not to report to work and were therefore incapable of making Sunday contributions or tuition payments.

"After seeking the advice of counsel, the [Foundation] board declined the Diocese's request for funds, citing restrictions in donor agreements, the need to honor donor intent, and the [Foundation] board's fiduciary duties as custodian of endowment funds. The [Foundation] board did agree to have [the Foundation] staff try to raise emergency funds and ask certain donors to ease restrictions to allow for immediate distribution. In late April, [the Foundation] granted about $1.5 million to the Diocese to support the churches and schools most impacted by the shutdown.

"In early June, [Vann] arranged for a Zoom meeting with the [Foundation] board's executive committee. What happened during that meeting is disputed. According to Vann, he expressed disappointment in the delays in the search for a permanent executive director and the lack of progress in establishing a strategic plan for [the Foundation]. According to Nunn, [Vann] told the executive committee that Nunn was a liar, claimed that Nunn had single handedly caused irreparable damage to the relationship between [the Foundation] and the Diocese by refusing to invade endowment funds, and demanded that the [Foundation] board terminate Nunn's contract.

"On June 19, Vann fired the entire [Foundation] board without notice. He then reconstituted a new [Foundation] board, who in turn terminated Nunn's contract, appointed a new interim executive director, and began efforts to find a permanent executive director. A few days later, [Vann] sent a letter to [the Foundation] donors announcing his decision 'to bring new leadership to [the Foundation] by appointing a new board.' His letter

6

reported that the new board members were eager to develop a strategic plan and complete the search for a permanent executive director.

"[Vann]'s reasons for terminating the [Foundation] board members are disputed. According to Vann, he removed them because they had failed to retain a new executive director, failed to make any meaningful progress in developing a strategic plan, and created a crisis of confidence during a global pandemic, when people needed [the Foundation]'s services more than ever. According to Nunn, Vann terminated her and the [Foundation] board members because they had refused to distribute restricted [Foundation] funds in response to Jensen's March request.

"That brings us to the e-mail that is the focal point of this lawsuit. Several weeks after her termination, on July 7, Nunn sent a three-page e-mail to the 47 members of the Catholic foundation [chief executive officer] forum, which includes leaders at Catholic foundations and dioceses across the country. Her e-mail bore the subject line, 'You can't make this stuff up.' In the introductory paragraph, Nunn observed that there has been much focus 'on protecting donor intent in light of the lifting of [the] statute of limitation on sexual abuse claims,' that her situation involved 'a different aspect to consider when protecting donor intent and assets,' and that she was sending the e-mail 'to create an awareness of a situation that completely caught our board of directors off guard.' She added, 'The following should start with "Once upon a time" . . . it sounds like fiction, but it is not.'

"Nunn's e-mail described Jensen's letter at the beginning of the pandemic asking the [Foundation] board to distribute [Foundation] funds to assist with a working capital deficit, the [Foundation] board's denial of the request based on the terms of the donor agreements, how Vann was '[d]isappointed in the rejection,' and how [Vann] subsequently terminated all

7

[Foundation] board members and reconstituted a new board. The e-mail observed that Vann claimed to have the authority as the sole member of [the Foundation] to remove all the [Foundation] board members, and then quoted the provision from [Foundation]'s bylaws regarding removal of board members.

"Nunn's e-mail then concluded with a series of rhetorical questions: 'Is this considered a hostile take-over to distribute funds the diocese needs to cover debt? Lawsuits? Is this an overstep of authority? Is this the result of fatigue from the economic impact of the COVID crisis in addition to other financial stress? No one knows, it certainly was not shared or discussed prior to the removal of the Foundation board. No individual meetings to discuss this in detail, no dialogue, only a letter read on a Zoom call and an immediate departure. No response to requests for individual meetings with the Foundation board chair, only silence. [¶] Does the Foundation board have a fiduciary responsibility to fight this takeover to protect the donor intent and Foundation assets? All funds are irrevocably given to the Foundation. When the donor is the parish the funds are initially given after alienation is approved and documented. [¶] Could this happen to you if this precedence is determined acceptable? All rhetorical questions, but something to consider.'

"[Plaintiffs] felt personally attacked by Nunn's e-mail, which they interpreted as criticizing their financial integrity, accusing them of misappropriating and misdirecting the use of [Foundation] funds, and insinuating through innuendo and rhetorical questions that they might have used those funds for the cost of defending child sex abuse lawsuits. They believed Nunn's e-mail tarnished their reputations in the community and jeopardized their ability to serve the needy. Plaintiffs believed Nunn sent the

e-mail to undo the damage to her reputation and increase her potential job prospects with other Catholic institutions.

"Plaintiffs retained counsel, accused Nunn of defamation, and demanded that she send a retraction. Nunn did not respond." (*Vann v. Nunn, supra*, G060498, fns. and some capitalization omitted.)

PROCEDURAL HISTORY

Plaintiffs' complaint alleged causes of action for libel per se and intentional infliction of emotional distress. They alleged Nunn intended to suggest "against the backdrop of sex abuse litigation facing the Diocese" that Plaintiffs "acted unethically to countermand and thwart donor intent." Her objective, they claim, was to promote her own reputation at Plaintiffs' expense by making dramatic accusations to influential leaders within the Catholic charitable community.

Nunn's anti-SLAPP motion, as we previously noted, was denied by the trial court on the first prong of the anti-SLAPP analysis. The court rejected the notion Nunn's e-mail concerned an issue of public interest. In our prior opinion, we disagreed: "At its core, Nunn's e-mail concerned Vann's alleged efforts to access [Foundation] funds in contravention of donor agreements, his alleged disappointment in the [Foundation] board's rejection of the Diocese's request to release endowment funds, and his allegedly unauthorized removal of the [Foundation] board members. While not matters of statewide concern, these issues are necessarily the subject of widespread local interest. As Plaintiffs recognize, [Vann] serves over 1.3 million Catholics in Orange County, and Jensen, as the Diocese's [chief financial officer], oversees financial leadership teams at 64 parishes and 33 schools. Plaintiffs' alleged attempt to use donor funds in contravention of donor agreements impacts not only the donors themselves, but also thousands of Catholic

9

parishioners and other residents of Orange County who rely on [Foundation] funding and who depend on [Vann] and the Diocese for spiritual support and guidance." (*Vann v. Nunn, supra*, G060498, some capitalization omitted.) Finding that the e-mail constituted protected activity, we remanded the case to the trial court to conduct a second-prong analysis.

On remand, the trial court held a status conference and then took the second prong of Nunn's motion under submission. It does not appear the parties submitted any new evidence. The court issued a subsequent order granting Nunn's motion.

Plaintiffs timely filed separate appeals, which we consolidated into the present appeal.

DISCUSSION

I.

STANDARD OF REVIEW

As stated in our prior opinion: "We review a trial court's order denying an anti-SLAPP motion de novo. [Citation.] The statute requires us to 'consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' [Citation.] We therefore consider not only the complaint, but also the declarations filed in support of and in opposition to the anti-SLAPP motion. We do not weigh the credibility of that evidence, and we ""accept as true the evidence favorable to the plaintiff[s].""" (*Vann v. Nunn, supra*, G060498.)

## II.

### PLAINTIFFS MET THEIR BURDEN TO SHOW A PROBABILITY OF PREVAILING ON THEIR LIBEL CLAIM[3]

The second prong of an anti-SLAPP analysis "has been described as a summary-judgment-like procedure." (*Billauer v. Escobar-Eck* (2023) 88 Cal.App.5th 953, 962.) A plaintiff cannot simply rely on the allegations of his or her complaint. (*Ibid.*) Rather, the allegations must be supported by "'competent admissible evidence.'" (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940.) But the evidentiary standard is slightly relaxed to account for the early procedural posture of the case. "[E]vidence may be considered at the anti-SLAPP motion stage if it is reasonably possible the evidence set out in supporting affidavits, declarations or their equivalent will be admissible at trial." (*Id.* at p. 947.)

Moreover, a plaintiff's ""burden of establishing a probability of prevailing is not high: We do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law. [Citation.] Only a cause of action that lacks 'even minimal merit' constitutes a SLAPP. [Citation.]" [Citation.] "Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment *if the evidence submitted by*

---

[3] Plaintiffs do not challenge the trial court's ruling granting the anti-SLAPP motion as to their intentional infliction of emotional distress claim, and so our analysis is limited only to the libel claim.

*the plaintiff is credited.*"""" [4] (*Edward, supra,* 72 Cal.App.5th at pp. 789–790, italics added.)

Against this backdrop, we turn to Plaintiffs' libel per se cause of action. Libel is written defamation, requiring a publication that is false, defamatory, unprivileged, and either has a natural tendency to injure or causes special damage. (*Bui v. Ngo* (2024) 101 Cal.App.5th 1061, 1072 (*Bui*).)

"'A special meaning has been given to the term "libel per se" in California and some other states. Where the statement is defamatory *on its face*, it is said to be libelous per se, and actionable without proof of special damage. But if it is defamation *per quod*, i.e., if the defamatory character is not apparent on its face and requires an explanation of the surrounding circumstances (the "innuendo") to make its meaning clear, it is not libelous per se, and is not actionable without pleading and proof of special damages. [Citations.] [¶]The doctrine has been codified. "A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof."'" (*Barker v. Fox & Associates* (2015) 240 Cal.App.4th 333, 351–352.)

Also, "[i]n *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, the Supreme Court explained that federal constitutional principles require persons who qualify as public officials or public figures to prove an additional element—that the communication was made with actual malice. [Citation.] Private plaintiffs, in contrast, need only show negligence." (*Bui, supra,*

---

[4] As we discuss below, the trial court's analysis did not seem to credit Plaintiffs' evidence.

101 Cal.App.5th at p. 1072.) Thus, "[a] threshold determination in a defamation action is whether the plaintiff is a 'public figure.'" (*McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 113.)

*A. Public Figure*

In *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, the United States Supreme Court "explained that it had imposed the actual malice requirement on defamation actions by both public officials and public figures because such persons 'usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy' [citation] and because they 'have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.'" (*Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 263 (*Khawar*).) "Over time, courts clarified there are two general types of public figure individuals. Those who 'achieve such pervasive fame or notoriety' are 'public figure[s] for all purposes and in all contexts.' [Citation.] In contrast, those who voluntarily inject themselves or are drawn into a particular public controversy become public figures for a limited range of issues. [Citation.] These latter types of individuals are often referred to as limited purpose public figures." (*Bui, supra*, 101 Cal.App.5th at p. 1073.)

We cannot say either Vann or Nunn is a public figure for all purposes, as there is no evidence either has achieved the pervasive fame or notoriety required. Thus, we assess whether they are limited purpose public figures, which requires three elements. "First, there must be a public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants. Second, the plaintiff must have undertaken some voluntary act through which he or she sought to

13

influence resolution of the public issue. In this regard it is sufficient that the plaintiff attempts to thrust him or herself into the public eye. And finally, the alleged defamation must be germane to the plaintiff's participation in the controversy." (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1577.) But "[a]lthough, '[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of [their] own,' the Supreme Court has cautioned 'the instances of truly involuntary public figures must be exceedingly rare.'" (*Bui, supra*, 101 Cal.App.5th at p. 1073.)

Vann has conceded that he is a public figure for purposes of this lawsuit as the trial court concluded. We agree. He is the bishop of the Diocese and the sole member of the Foundation. He is the public face of the Diocese, and as such, is a public figure for purposes of the Foundation's operations.

The same is not true of Jensen, the chief financial officer for the Diocese. We see no evidence in the record of a public controversy, debated publicly, into which Jensen attempted to insert herself. And the only voluntary act undertaken by her, allegedly, was to seek money from the Foundation to shore up shortfalls during the COVID-19 pandemic. The record does not show this issue was being debated publicly at the time, or that Jensen made any public pronouncements on it.[5]

---

[5] Jensen was mentioned in an article in the Los Angeles Times about the issue, but this article postdates Nunn's e-mail. (See Ryan, *O.C.'s bishop, a $12-million problem and a secret fight stretching to the Vatican*, L.A. Times (Aug. 26, 2020) <https://www.latimes.com/california/story/2020-08-26/oc-catholic-donors-at-odds-bishop-kevin-vann> [as of Mar. 23, 2026], archived at: <https://perma.cc/HQ2K-BD6K>.) As Plaintiffs point out, it was Nunn's e-mail which precipitated public discussion of these allegations against the Diocese, not any act by Jensen. (See *Gallagher v. Connell* (2004) 123 Cal.App.4th 1260, 1273.)

Both Nunn and the trial court cite *McGarry* in concluding that Jensen is a limited purpose public figure. In that case, a University of San Diego football coach sued the college for defamation after he was terminated and public statements were made regarding his alleged misconduct on the job. (*McGarry v. University of San Diego, supra*, 154 Cal.App.4th at p. 115.) Citing several federal cases finding sports figures to be limited purpose public figures, Division One of this court held McGarry too was a public figure because he "voluntarily entered the public arena as a college football coach, and the statements dealt exclusively with his performance of the public role he voluntarily undertook." (*Ibid*.)

We do not find *McGarry*'s reasoning persuasive here. Jensen is not a sports figure. Moreover, *McGarry* did not analyze the elements for being characterized as a limited purpose public figure, which were discussed at least 11 years prior in *Copp v. Paxton* (1996) 45 Cal.App.4th 829, 845–846. Neither did Nunn in her papers below. She never attempted to identify a publicly debated controversy in which Jensen inserted herself. Instead, Nunn focused on communications between Jensen and the Foundation which related to the Diocese's financial operations. She also insinuated Jensen was a public figure due to a letter sent by Vann in June 2020 to donors announcing changes to the Foundation board. But this letter does not even mention Jensen's name. None of this evidence suggests Jensen's voluntary involvement in a public controversy surrounding the Foundation. There was insufficient evidence for the trial court to conclude Jensen was a limited purpose public figure simply by virtue of her position in the Diocese.[6]

---

[6] We do not intend to suggest that Nunn is precluded from gathering or presenting evidence that Jensen is a limited purpose public

*B. Falsity*

The central question in a defamation case "is 'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.' [Citation.] This is ordinarily a question of law for the court, 'unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood.' [Citation.]

"In determining whether the disputed statement communicates or implies a provably false assertion of fact, we look at the totality of the circumstances, looking first to the language of the statement and whether it was understood in a defamatory sense, and then considering the context in which the statement was made. [Citation.] We focus not on the literal truth or falsity of each word in a statement, but rather on ""whether the "gist or sting" of the statement is true or false, benign or defamatory, in substance."" [Citations.] We also consider 'whether the reasonable or "average" reader would so interpret the material. [Citations.] The "average reader" is a reasonable member of the audience to which the material was originally addressed.'" (*Edward*, *supra*, 72 Cal.App.5th at pp. 790–791.)

As we recognized in our prior opinion, there are two basic assertions made in Nunn's e-mail. First, Nunn stated Plaintiffs were trying to get the Foundation to "invade" endowment funds in contravention of donor agreements. Second, Nunn suggests Vann removed the entire slate of Foundation board members because the board refused to "release endowment fund restrictions."

---

figure for purposes of summary judgment or trial. Our conclusion on this issue is limited only to the anti-SLAPP motion context.

We need not even speculate as to the reaction recipients of the e-mail might have had. Plaintiffs presented declarations from two leaders who received it and were taken aback by its allegations. [7] One stated the allegations were "sensationalized." Both remarked they had never seen such an e-mail dispatched within the community of foundation leadership.

Nunn argues Plaintiffs have not made out a colorable claim for libel per se. She notes this court's prior opinion effectively rejected the notion Nunn was suggesting Plaintiffs were seeking funds to defend sex abuse litigation. As a result, Nunn argues, the remaining assertions in her e-mail are not defamatory per se, because they do not, on their face, insinuate unethical or criminal behavior, but rather, a "corporate governance dispute."

We disagree. A publication is libelous per se if a reasonable reader would perceive "a meaning which tended to injure the subject's reputation" without the need for explanation or extrinsic facts. (*Barnes-Hind, Inc. v. Superior Court* (1986) 181 Cal.App.3d 377, 386–387.) Importantly here, "[l]anguage may be libelous on its face even though it may also be susceptible of an innocent interpretation." (*Id.* at p. 384.) "The courts have manifested liberality, at the pleading stage, in finding libel per se. Thus it has been said to be 'error for a court to rule that a publication cannot be defamatory on its face when by any reasonable interpretation the language is susceptible of a defamatory meaning.'" (*Id.* at p. 385.)

By discrete statements of fact in her e-mail which may have been accurate, Nunn is essentially urging us to overlook a central principle in our analysis. ""[T]he publication in question must be considered in its entirety; '[i]t may not be divided into segments and each portion treated as a separate

---

[7] This evidence heavily undercuts Nunn's argument the e-mail did not "ha[ve] a tendency to injure" plaintiffs in their occupation.

17

unit.' [Citation.] It must be read as a whole in order to understand its import and the effect which it was calculated to have on the reader [citations], and construed in the light of the whole scope and apparent object of the writer, considering not only the actual language used, but the sense and meaning which may have been fairly presumed to have been conveyed to those who read it."'" (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 261.)

Reasonably read as a whole, Nunn's e-mail could have conveyed the message Plaintiffs had engaged in unethical behavior in their professional capacities. We have no doubt the e-mail could be viewed as defamatory per se—if it contained provably false statements of fact. The next question is whether Plaintiffs presented evidence of falsity. We conclude they did.

1. First Assertion: Plaintiffs Pressured the Foundation to Invade Endowment Funds

Communications between Jensen, Foundation board chairman Stephen Muzzy, and Nunn in or around March 2020 indicate that the Diocese was seeking financial support for parishes and schools projected to be hardest hit by the COVID-19 pandemic stay-at-home order. In a letter to Muzzy dated March 18, 2020, Jensen formally requested that the board "discern, discuss and approve the distribution of certain endowment funds to meet the ever-growing fiscal needs of the parishes and schools of the Diocese." (Some capitalization omitted.) She then stated, "All decisions should respect the intent of the donors and acknowledge the unprecedented times of growing need for both sustainability and candidly, survivability of certain parish and school ministries." (Capitalization omitted.) She asked the board to consider three distributions: (1) 50 percent from the "Parish in Need Endowment Fund" for nine parishes "in need that do not have 90[ ]days operating cash on

18

hand"; (2) 25 percent from the "Schools Tuition Assistance Endowment" for "schools whose parents lose their jobs and may not be able to meet their tuition obligations and need assistance"; and (3) 25 percent from the "Bishop Vann Marian Alliance Endowment Fund" for the "Mari[a]n Alliance Schools (separate from the Schools Tuition Assistance Endowment distribution)." Each proposed distribution was qualified by the promise that "any monies not used during the crisis [would] be returned to the endowment." (Capitalization omitted.) The board ultimately declined this request and instead disbursed smaller sums in the form of grants to schools and parishes.

In her declaration, Jensen stated her goal was always to ensure parishes and schools in the Diocese had "enough working capital on hand to meet their financial obligations for 90 days without income," and she knew "that certain parishes and schools, particularly in less affluent areas, did not have sufficient cash reserves." She had identified 16 schools where the shortfall was $8 million. She was aware based on prior disclosures that the Foundation "had a significant amount of unrestricted funds available" to it and thought those funds could potentially be used.

Thus, Plaintiffs' evidence makes out a prima facie showing that Jensen was not trying to engage in some sort of shake-down of the Foundation for restricted funds; rather, she was simply trying to find pools of unrestricted cash to shore up struggling schools and parishes in the Diocese during the shutdown. And she asked the Foundation to do the necessary inquiry into the possibility, which it did. Indeed, Muzzy himself submitted a declaration in support of Plaintiffs, stating: "These requests by . . . Jensen were not inappropriate. These requests by . . . Jensen are how the relationship between the Diocese and Foundation is supposed to work. When the Diocese identifies needs and makes requests, then it is the Foundation's

19

job to determine what the Foundation can give to support Diocesan ministries." The trial court did not credit this evidence at all, and it should have.

Nunn argued—both in her brief and at oral argument—that the statement in her e-mail regarding the nature of Jensen's request was true.[8] She further argues that her e-mail does not insinuate Jensen's request "was suspicious, inappropriate, unethical, or illegal."[9] But it is the message conveyed to the reader which we must analyze for truth or falsity. In the overall context of the e-mail, a reasonable reader might infer that Jensen's request was at best unusual, and at worst, improper.

Indeed, reading Nunn's e-mail, the reader might believe Jensen's request left the Foundation board feeling uneasy: "After reviewing the endowment fund agreements and *in consideration of their fiduciary responsibility and the terms of gift and fund agreements in place for almost 20 years[,]* the board denied the request to *invade the endowment funds to that extent* with the offer to make requests of living donors to release the restriction of all or a portion of their restriction to permanent endowment." (Italics added.) Muzzy's declaration indicates the board was not as concerned as Nunn made them out to be. And notably, Nunn did not mention Jensen's

---

[8] Specifically, Nunn points to this sentence in her e-mail: "[Jensen] requested distributions from [the] Foundation endowment funds of over 25 [percent] of two of the largest endowment funds in addition to an increased percentage of in all other distributable inferring that any 'buckets of money' the Foundation had should be distributed to the [D]iocese to help with a 30 day working capital deficit in excess of $8 million."

[9] We are somewhat skeptical of this contention; indeed, if Nunn did not feel Jensen's request was inappropriate, one wonders why she felt it necessary to alert the e-mail recipients in the first place.

request that donor intent be respected when searching for available funds—a key fact that would have given the reader valuable context.

2. Second Assertion: Vann Dismissed the Board in Retaliation for Its Refusal To Lift Restrictions on Endowment Funds

Vann stated in his declaration that he had asked the Foundation board as early as November 2018 to generate a strategic plan to maximize fundraising. This was on the heels of successes he had experienced by drafting a strategic plan for the Diocese's leadership. His goal, he said, was to ensure that the Foundation's efforts to support the Diocese's work in the community could be made most effective.

On February 25, 2020, weeks before the COVID-19 pandemic shutdown orders went into effect, Vann sent a letter to Muzzy and the Foundation board stating his desire to have a strategic plan in place and to have a permanent executive director heading up the Foundation within 60 to 90 days. It did not appear anything was done to meet these objectives, and on June 18, 2020, Vann relieved the Foundation Board members from their positions and appointed a new slate of board members. He averred that the new board had succeeded in securing the services of a qualified permanent executive director for the Foundation: Kimberly Jetton, who, with the assistance of her team, had produced a strategic plan within a few months' time.

Neither Nunn nor the trial court addressed this possible basis for Vann's actions. Instead, Nunn focuses on a technically true fact in her e-mail—all Foundation board members were relieved of their positions—and argues the remainder of her statements around that fact constitute opinions protected by the First Amendment because all facts the reader would need to assess the opinion were fully disclosed. This is inaccurate because all facts

21

were clearly not disclosed. Nunn did not tell the e-mail recipients about Vann's request for a strategic plan or the protracted absence of a permanent executive director. Again, these were key facts the reader would need to make an informed judgment about Vann's actions and whether they could be construed as retaliatory.

We conclude the Plaintiffs presented sufficient prima facie evidence the accusations made in Nunn's e-mail were false.

*C. Privilege*

Nunn argues the e-mail is protected by the common interest privilege under Civil Code section 47, subdivision (c). "Section 47, subdivision (c) extends a conditional privilege against defamation to statements made without malice on subjects of mutual interests." (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 287.) "This privilege applies to communications between church members on church matters." (*Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1556.)

Plaintiffs argue the common interest privilege is inapplicable here because the recipients of the e-mail were affiliated with different dioceses. They point to the declaration of Matthew Althoff, chancellor of the Diocese of Sioux Falls, who received Nunn's e-mail. Althoff averred that "leaders of Catholic foundations do not share a common interest regarding the inner workings of any one foundation (other than a leader's own foundation), or the relationship that a different foundation has with its local diocese."

But even though the recipients of the e-mail were affiliated with different Catholic dioceses, their affiliation appears to be with the same church. In fact, that would have been the very impetus for Nunn to issue a

22

warning to other foundation leaders. They were similarly situated. The next question is whether Nunn sent the e-mail with malice.

*D. Malice*

"[I]n the context of an anti-SLAPP motion the plaintiff must . . . establish only a 'probability' that he or she can produce clear and convincing evidence of actual malice. [Citation.] [¶] "'[A]ctual malice can be proved by circumstantial evidence." [Citation.] Considerations such as "anger and hostility toward the plaintiff," "reliance upon sources known to be unreliable [citations] or known to be biased against the plaintiff," and "failure to investigate" may, "in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication." [Citation.] Such evidence is relevant "to the extent that it reflects on the subjective attitude of the publisher."' [Citation.] However, 'failure to investigate, without more, generally is insufficient' to show malice. [Citation.] And 'we will not infer actual malice solely from evidence of ill will, personal spite or bad motive.'" (*Edward, supra*, 72 Cal.App.5th at p. 793.)

As we have already intimated, the assertions in the e-mail seem to mischaracterize or distort Plaintiffs' actual conduct—certainly, we believe, a reasonable trier of fact might think so. But the timeline of events also provides compelling evidence that Nunn's e-mail may have been motivated by actual malice toward Plaintiffs rather than a genuine desire to warn other foundation leaders about improper requests for endowment funds.

First, Jensen's request to the Foundation and the Foundation Board's refusal thereof occurred in March 2020. Yet Nunn did not send her e-mail until July 2020, after her contract with the Foundation was terminated. If Nunn believed the Diocese was attempting to "invade" endowment funds

23

for uses not authorized by the donors, she did not seem to think it an issue worthy to raise when it was actually happening.

Second, the picture painted by Nunn's e-mail is one in which the Diocese acted swiftly to summarily dismiss the board after it refused Jensen's request. But the board was not dismissed until June 18, nearly three months after the refusal. And Nunn's e-mail followed less than one month after that. A reasonable trier of fact could conclude Nunn's e-mail was her way of seeking retribution against the Diocese for its treatment of her.

Plaintiffs have demonstrated that their libel cause of action has minimal merit under the second prong of the anti-SLAPP analysis to proceed.

DISPOSITION

The order granting Nunn's special motion to strike is reversed as to Plaintiffs' libel claim only, and the matter remanded with instructions for the trial court to enter an order denying the motion as to the cause of action for libel per se. In all other respects, the judgment is affirmed. As the prevailing party on the issue appealed, appellants are to recover their costs on appeal.

MOTOIKE, ACTING P. J.

WE CONCUR:


MOORE, J.


DELANEY, J.

24